Ronald G. LaRUE, Appellant,

v.

Frances Overstreet LaRUE, Appellee.

No. 12–89–00138–CV.

Court of Appeals of Texas,
Tyler.

May 29, 1992.

**388**

Julie A. Owens, Lufkin, for appellant.

William R. Pemberton, Crockett, for appellee.

RAMEY, Chief Justice.

This appeal arises from the trial court's judgment against Appellant Ronald G. LaRue awarding Appellee Frances Overstreet LaRue $7,000 as payment for six years of child support arrearages. We will reform and affirm the cause.

Appellant Ronald G. LaRue ("Appellant") and Appellee Frances Overstreet LaRue ("Appellee") were divorced in the early 1970's, and Appellee was awarded custody of their one female child, Frances Melissa LaRue ("Melissa"). Appellee later married Buddy Canada ("Canada"), who, for the most part, acted as Melissa's father during her childhood. Then, sometime prior to 1982, Appellee and Canada also divorced, and Appellee married Tommy Tabor ("Tabor").

Appellee's version of the events was that after her marriage to Tabor, Appellant advised her that he would relinquish his parental rights in Melissa if she and Tabor would consider adopting Melissa. Appellee stated that she showed the letter to Tabor and to Canada to get their opinion on the matter.[1] She then discussed the matter with her lawyer, Joe Griffith, who advised her to initiate the termination suit since she and Appellant had experienced turmoil over visitation rights. Appellee stated that

when she and Tabor agreed to proceed with the adoption, Griffith drafted the requisite documents for the termination and adoption suit. Although Griffith stated that he had no independent recollection of the events surrounding the termination suit, his records indicated that in August of 1982, he sent Appellant a letter stating that since Appellant had agreed to relinquish his parental rights, Appellant should execute and return the enclosed Affidavit of Relinquishment of Parental Rights ("affidavit"). On August 26, 1982, without personal legal representation, Appellant signed and returned the affidavit to Griffith. The last two paragraphs of the affidavit provide:

"I fully understand that a lawsuit will be promptly filed in a court of competent jurisdiction to terminate forever the parent-child relationship between me and the above named child. Termination of the parent-child relationship is in the best interest of the child. I understand that I make this termination possible by executing this affidavit. With that in mind, I hereby declare that this Affidavit of Relinquishment of Parental Rights is, and shall be, irrevocable for 60 days. I FULLY UNDERSTAND THAT IF I CHANGE MY MIND, I CANNOT FORCE THE MANAGING CONSERVATOR TO DESTROY, REVOKE OR RETURN THIS AFFIDAVIT AND THAT I CANNOT TAKE BACK OR UNDO THIS AFFIDAVIT IN ANY WAY DURING THIS 60–DAY PERIOD. I FURTHER UNDERSTAND THAT MY PARENTAL RIGHTS PROBABLY WILL HAVE ALREADY BEEN ENDED FOR ALL TIME BEFORE THIS 60–DAY PERIOD EXPIRES. I also understand that if my parental rights have not been ended within this 60–day period, this affidavit shall remain in full force and effect until I revoke it. I FULLY UNDERSTAND THAT AT ANY TIME UNTIL THIS AFFIDAVIT IS REVOKED, MY

---

1. Both Canada and Tabor testified that they had also read this letter though their testimony conflicted as to whether the letter was handwritten or typed and whether it came from a lawyer or from Appellant himself. Appellee stated that she could not produce the letter at trial because it was destroyed in a fire in 1982.

PARENTAL RIGHTS MAY BE TERMI-NATED FOR ALL TIME."

"It is in the best interest of my child that this be my last parental act and deed. Not wishing to appear or be cited in the termination suit, I hereby waive any right to issuance, service and return of all process in any suit to terminate the parent-child relationship between the child and me without further notice to me. I FULLY UNDERSTAND THAT I WILL NOT BE INFORMED ABOUT THIS SUIT."

Thereafter, on December 7, 1982, Appellee and Tabor filed their original petition for termination and adoption along with the affidavit executed by Appellant. At the time of the filing, Melissa was 12 years old. Linda Hunt, Houston County District Clerk, testified that a home study file-marked September 22, 1983 was the last document filed in the termination and adoption suit. At the time of the instant trial, Appellee and Tabor's petition for termination and adoption was pending on the court's docket. Hunt also testified that Appellant was in arrears for all support payments which accrued after August of 1982, the month he executed the affidavit of relinquishment.

Appellee testified that she and Tabor later decided not to pursue the termination and adoption suit because her father advised them against terminating Appellant's parental rights. However, Appellee and Tabor permitted the proceeding to remain on the docket. With regard to her father's advice, Appellee testified as follows:

He said that she [Melissa] was a LaRue, and that she deserved something and not to take that away from her. So, you know, he was a lot older and a lot wiser than I was. Tommy and I both talked to him and listened to him, and he said "Please don't do it." We decided not to do it.

Appellee further testified that Appellant called her in December of 1982 near Christmas time and was yelling at her and asking

her why she had not gone through with the adoption. It is noted that the petition for termination and adoption was filed in court at or about the time of Appellant's alleged telephone call to Appellee. She also stated that about the time Appellant called, her father brought her a copy of a Crockett newspaper article stating that the LaRues had discovered oil and gas on their farm in Lovelady, Texas, and he stated that the LaRues' oil and gas discovery probably accounted for Appellant's desire to expedite the adoption proceedings.

In 1986, Appellee and Tabor divorced. Thereafter, Appellee evidently had a brief marriage to Eddie Mayes.[2] Appellee subsequently married Mr. Cross ("Cross"). Cross was still married to Appellee at the time this suit came to trial.

Appellee admitted that following Appellant's execution of the affidavit, she never informed him that she and Tabor did not intend to consummate the adoption or that his parental rights had not been terminated. Likewise, she admitted never having told him that he had a right to resume visitation with his child. Moreover, Appellee admitted that during the almost six years following her commencement of the termination and adoption proceedings, she never requested a child support payment from Appellant nor informed him that he was in arrears in such payments.

Appellee further stated that despite the terms of the Agreed Order of June 21, 1979, which specified the parties' rights and responsibilities with regard to Melissa, she allowed Melissa to use surnames other than "LaRue." The pertinent portion of the Agreed Order stated:

"IT IS FURTHER ORDERED that the minor child of the parties shall be enrolled in school and any and all other functions under her correct name of *Frances Melissa LaRue*. The parties hereto *shall exercise their continuing best efforts to see that said minor child uses her correct name* and that all persons with whom said child has any con-

---

**2.** Eddie Mayes may have been Appellee's husband before Tommy Tabor; the evidence is not clear.

tact or relationship also use said child's correct name of Frances Melissa La-Rue." (emphasis added)

Appellee stated that Melissa used different surnames because she wanted her last name to be the same as her mother's. Appellee testified that Melissa began using the name "LaRue" again only after she got her driver's license. Appellee explained that because "LaRue" was the surname used on Melissa's birth certificate, Melissa was required to use that name on her driver's license as well.

With regard to Appellant's treatment of Melissa, Appellee testified that at some point, Appellant was a teacher where Melissa attended school, but that he had never made an attempt to converse with her after 1982. Appellee also testified that Appellant's wife, Colleen, was a school teacher at Crockett High School and knew that Melissa was using the surname "LaRue"; Appellee argued that Colleen's knowledge of this was enough to put Appellant on notice that Melissa had not been adopted.

Ray McClain, Principal of Crockett High School and a custodian of records for the Crockett Independent School District ("CISD"), testified that according to CISD's records, Melissa had used the following surnames after June 21, 1979: "Canada" through grade 6, "Tabor" during grades 7, 8, 9 and 10 and through January 13, 1986, when she transferred from public school to the Carden School. When Melissa returned to CISD in her junior year of high school, she used "LaRue" through the 1986–87 school year.

Appellant's testimony conflicts with Appellee's in several respects. Appellant testified that it was not his idea to relinquish his parental rights and stated the following regarding the letter he allegedly wrote:

Q. And you wrote the letter to Ms. Cross [Appellee] suggesting that Tommy Tabor adopt the child?

A. No sir, I sure did not.

Q. So that Chief Canada and Ms. Cross and Tommy Tabor are lying?

A. Sir, I did not write that letter, nor did anyone write that letter for me; and my signature wasn't on any letter like that. I'm sorry, but if they say it is then, yes, they will have to be lying.

Instead, Appellant testified that Appellee, acting alone or with Tabor, requested that Tabor be allowed to adopt Melissa. Unlike Appellee, he neither hired nor consulted a lawyer about the termination or adoption proceedings. As for the affidavit, he testified that Joe Griffith sent it to him in the spring of 1982, but that he did not sign it until late that summer because he was uncertain he should do so. Appellant stated that he finally decided to sign the affidavit, because despite his and Colleen's diligent efforts to establish a relationship with Melissa, they failed, due to outside interference. Receiving no indication that the adoption had not taken place, Appellant made no further attempt to visit Melissa or make contact with her. Appellant testified that he first learned that the termination and adoption had not taken place when he was served with Appellee's suit for past due child support in the summer of 1988. At that time, Melissa had already been 18 years of age for several months, so his visitation rights had ended. Appellant testified that neither Appellee, her lawyer, her friends or family ever informed him that the adoption had not been completed. Appellant stated that he was not surprised that Melissa started using the name "LaRue" again, because he knew Appellee had married someone about Melissa's age, and he had heard that Melissa was upset about the marriage.

With regard to his occupation, Appellant testified that he was currently self-employed as a rancher-farmer. He further stated that the gas wells Appellee had alluded to were marginal wells, and that he had not been receiving any revenues from them.

Appellant's wife, Colleen, also testified on his behalf. She stated that she and Appellant had been married since 1979, and that she had known Melissa all of Melissa's life. She expressed her fondness for Melissa and her desire to promote good relations between Appellant, Melissa and herself. Colleen also testified that after their mar-

riage, she and Appellant had decorated a bedroom just for Melissa and had tried to plan outings with her; however, she stated that Melissa had often canceled her visits because of conflicting activities or had simply refused to be available. Colleen also testified that despite their efforts to establish a relationship with Melissa, Melissa did not evidence much interest. With regard to the adoption proceedings, Colleen testified that it was Appellee who contacted them with the proposal that Tabor adopt Melissa. She stated that Appellant considered the proposal a long time before finally executing the affidavit.

As additional support for Appellant's position, his lawyer called Appellant's accountant and friend, Murdock Murchison, to testify. Murchison stated that he had known Appellant since 1978, and that he knew that Appellant had fathered a daughter named "Melissa". He further stated that in 1983, Appellant had informed him that he had terminated his parental rights to Melissa and had inquired about the tax consequences of having taken that action. Murchison stated that thereafter, Appellant never claimed Melissa as a dependent on his income tax returns, nor in any other way manifested that he still had any type of parental relationship to or legal responsibility for Melissa.

Following the close of testimony, the trial court denied both parties' motions for contempt, denied Appellee's request for attorney's fees, and entered judgment against Appellant for $7,000 in past due child support.[3] On appeal, Appellant raises 19 points of error challenging the legal and factual sufficiency of the evidence to support certain findings of fact and conclusions of law made by the trial court pertaining to equitable defenses raised by Appellant. We find meritorious his points of error pertaining to the equitable defense of estoppel. However, before considering those points we will first address Appellee's argument regarding Appellant's waiver of error.

■ Appellee asserts that Appellant has waived any error in the findings of fact because he failed to request additional or amended findings under TEX.R.CIV.P. 298. We disagree. In the instant case, the trial court entered specific findings of fact and conclusions of law regarding the defenses of laches and estoppel in addition to findings on at least one element of each of these defenses. Thus, no additional request for findings of fact under Rule 298 was required, and there was no waiver. *See Pinnacle Homes, Inc. v. R.C.L. Offshore Engineering Co.*, 640 S.W.2d 629, 630 (Tex.App.—Houston [14th Dist.] 1982, writ ref'd n.r.e.).

■ As an affirmative defense to Appellee's claim for child support arrearages, Appellant pled estoppel. In its third conclusion of law, the trial court held that the defense of estoppel was not available in this type of action. The effect of an estoppel is to prevent the assertion of what would otherwise be an unequivocal right; it cannot arise except when justice to the rights of another so demands. 34 TEX. JUR.3D *Estoppel* § 6, p. 550 (1984). The fact that the defense of estoppel is rarely asserted with success in child support cases does not foreclose its availability as a legitimate, effective defense in appropriate circumstances. *See Gawlik v. Gawlik*, 707 S.W.2d 256, 259 (Tex.App.—Corpus Christi 1986, no writ); *Texas Dept. of Human Resources v. Allred*, 621 S.W.2d 661 (Tex. Civ.App.—Waco 1981, writ dism'd); *Houtchens v. Matthews*, 557 S.W.2d 581 (Tex.Civ.App.—Fort Worth 1977, writ dism'd). Thus, the trial court's third conclusion of law pertaining to the unavailability of the estoppel defense in the instant case was erroneous.

Next, we consider whether the evidence was legally sufficient to support the trial

---

**3.** Past due payments were calculated under the Agreed Order at $100 per month for six years. Upon Appellee's instigation of the instant suit, Appellant made two payments to Appellee totalling $600. These two payments were equivalent to the amount of child support owed by Appel- lant for arrearages that had accrued *before* he had executed the Affidavit of Termination of Parental Rights. Thus, the trial court gave Appellant a $600 credit for payment of those pre-affidavit arrearages.

court's findings of fact related to estoppel. Here, the trial court made the following fact findings pertaining to Appellant's defense of estoppel:

4. That, at the time of the filing of the Motion for Contempt for Failure to Pay Child Support herein by Petitioner, Frances Overstreet LaRue Cross, Respondent had *wilfully disobeyed* said Order by failing to make periodic payments of child support as ordered, ... (List of arrearages omitted)

10. That Respondent, Ronald G. LaRue, *wilfully disobeyed* the Order of June 21, 1979, by refusing to pay child support on each of the dates set forth in Paragraph 4.

14. That *no further action was taken on said Petition after the filing thereof and of Respondent's Affidavit of Relinquishment of Parental Rights,* and said Cause is still pending on the docket of the Court.

15. That *within a short period of time after same was filed,* Respondent, Ronald G. LaRue, *should have known* that said termination proceeding was not going to be completed.

16. That *within a short period of time* after same was filed, Respondent, Ronald G. LaRue *did know that said termination proceeding was not going to be completed.*

24. That Petitioner never led Respondent to believe or represented to him that the adoption and termination had been completed or that he had no further obligations under any court order or that he was no longer a legal parent of the child.

25. That Respondent did not rely on any false representations by Petitioner.

26. That Respondent suffered no detriment because of any such representations.

(emphasis added.)

■ The same standard of review is used for a bench trial as for a jury trial when evaluating the legal sufficiency of the evidence. *Zieben v. Platt,* 786 S.W.2d 797, 799 (Tex.App.—Houston [14th Dist.] 1990, no writ). Since Appellant had the burden of proving the affirmative defense of estoppel, his challenge to the legal sufficiency of the above-enumerated fact findings will be upheld only if he demonstrates that the evidence in support of estoppel was so strong that reasonable minds could draw only one conclusion from the evidence. *Collora v. Navarro,* 574 S.W.2d 65, 68 (Tex.1978); Cornelius, *Appellate Review of Sufficiency of the Evidence Challenges in Civil and Criminal Evidence Points on Appeal,* 37 Tex. B.J. 439, 440 (1983).

In order to prevail on the affirmative defense of estoppel, a party asserting estoppel must establish five elements:

1. a false representation or concealment of material facts,

2. made with knowledge, actual or constructive, of those facts,

3. to a party without knowledge, or the means of knowledge, of those facts,

4. with the intention that it should be acted on, and

5. the party to whom it was made must have relied or acted on it to his prejudice.

*Gulbenkian v. Penn,* 151 Tex. 412, 252 S.W.2d 929, 932 (1952); *Gawlik,* 707 S.W.2d at 259.

■ We find that the evidence conclusively establishes all of these requirements. Appellee satisfied the first requirement by failing to divulge a material fact. Appellant and Appellee agreed that Tabor would adopt Melissa. Thereafter, Appellant took the monumental step of executing an affidavit relinquishing his parental rights and waiving further notice of the status of the termination and adoption proceedings. The unequivocal language of the affidavit prepared by Appellee's and Tabor's lawyer, indicated that Appellee and Tabor would indeed use that affidavit as a basis for obtaining the decree of termination. Moreover, the District Clerk's testimony revealed that at least as late as September 22, 1983, the termination and adoption suit was still progressing toward completion. When Appellee and her husband unilaterally decided not to consummate the proceedings, a duty arose to notify Appellant of

their decision, but they did not do so. Where a party is under a duty to speak, silence may give rise to estoppel as effectively as spoken words. *Knox v. Drews,* 202 S.W.2d 335 (Tex.Civ.App.—Austin 1947, writ dism'd, w.o.j.). Appellee unequivocally admitted that neither she, nor anyone acting for her, informed Appellant of the decision not to proceed with the adoption. The first element of estoppel was satisfied.

The second element mandates that the evidence demonstrate Appellee had actual or constructive knowledge of the fact that she did not divulge. The record contains ample evidence of Appellee's and Tabor's reversal of their decision regarding the adoption, which they didn't divulge to Appellant. Thus, this second element was satisfied.

The third element requires that Appellant had neither knowledge of Appellee's and Tabor's decision not to adopt, nor the means of discovering that fact. The evidence meets this test as to the first four years following Appellant's execution of the affidavit. Appellant's cessation of visitation and child support payments together with the manner in which he had his income tax returns prepared following his execution of the affidavit confirm that Appellant had no independent information of their decision not to adopt. Moreover, about the time that Appellant executed the affidavit, Melissa began using "Tabor" as her surname, and according to school records, Melissa was still using the name "Tabor" when she left the CISD in January of 1986. Thus, up to this date, there had been no outward manifestations indicating that Melissa might not have been adopted by Tabor.

■ Finally, at Appellee's request, Appellant relinquished his right to receive notice about the status of the suit by signing the affidavit prepared by Appellee's lawyer. That affidavit explicitly provided: "I FULLY UNDERSTAND THAT I WILL NOT BE INFORMED ABOUT THIS SUIT." Appellee will not now be heard to insist that Appellant should, nevertheless, have remained informed about the suit's status. Furthermore, we will not require a layman to continually attempt to monitor the progress of a court case, or hire a lawyer to do so, when the parties have done nothing to place him on notice of the reversal of their intentions, and every factor had demonstrated that the termination proceeding had been consummated. To impose such an affirmative duty on Appellant would undermine his statutory right to disassociate himself from the proceedings through waiver of the right to issuance, service and return of process in the termination proceeding. We have found no authority for imposing such a duty, and we decline to do so. Thus, until there was information available to Appellant that would have alerted him that his parental rights might not have been terminated, Appellant neither knew nor had the means of knowing that he should investigate the status of the adoption proceedings. We think Melissa's use of the surname "LaRue", after having used the surname "Tabor" for the preceding four years, should have alerted Appellant to the prospect that his parental rights might not have been terminated.

We will next determine when Appellant knew or reasonably should have known that Melissa had begun using the surname "LaRue." Appellant testified as follows with regard to his knowledge that Melissa was using his surname:

Q. (By Appellee's attorney) Mr. LaRue, do you remember when Ms. Cross' father, Bob Overstreet died back in March of 1987—May of 1987?

A. I remember when he died.

. . . . .

Q. You did read the obituary in the newspaper, didn't you?

A. I believe I probably did.

Q. And you heard the obituary on the radio?

A. I couldn't say that. Sometimes I might. I might not.

Q. You knew that the newspaper obituary gave her name as Melissa La-Rue, didn't you?

A. I'm not saying it didn't. It probably did if you say so. I don't remember, you know, that standing out to me or anything that she used that name.

Q. So she used the name LaRue, but it didn't bother you back in 1987? It didn't strike you as strange?

A. It didn't strike me as strange that she would use my name.

Q. Even though she had been adopted by someone else?

A. Well, the reason that I would not find it or did not find it strange was this. Her mother had married someone that was very close in age to Melissa, and I had been told that Melissa was very upset about that marriage.

. . . . .

Q. Mr. Larue, as a matter of fact, during all of the time that Melissa was in high school your wife, Colleen, was a teacher at the same school?

A. That's true.

. . . . .

Q. And she knew that during her junior and senior year Melissa was going by the name LaRue?

A. You'll have to ask her that.

Q. She never mentioned that to you?

A. She never specifically said to my recollection that Melissa was using my name.

Q. What did she say in that regard?

A. I just couldn't tell you exactly what she said.

Although this testimony conclusively establishes that, at some point during the 1986–87 school year, Appellant knew Melissa was using the surname "LaRue," it does not establish the actual date Appellant learned of the name change. However, there is testimony evidencing the month in which Appellant should reasonably have learned that Melissa was using the surname "LaRue." Ray McClain testified that Melissa returned to Crockett High School during the 1986–87 school year. He further stated that although CISD's records did not clearly indicate that Melissa had returned at the beginning of that school year, at the time Melissa took the exit-level test in October of 1986, she was using the surname "LaRue" at Crockett High School. Additionally, Appellee testified that Appellant's wife, Colleen, was a teacher at that high school during the time Melissa was a student there, and Appellant's testimony confirmed that fact. Furthermore, Appellant affirmatively acknowledged that at sometime during this period, he knew she had reverted back to the use of his surname in spite of the apparent termination of the parent-child relationship. Thus, in October of 1986, Appellant should reasonably have known that Melissa was using the surname "LaRue," and he was on notice that he should investigate the termination and adoption proceeding. Consequently, in October of 1986, Appellant had notice that Melissa was using his surname, and should have exercised his means of discovering the status of his parental rights. The third element was satisfied for the first 49 months following the execution of the affidavit.

The fourth element of estoppel requires a showing that Appellee intended the concealed information to be acted upon. The evidence also supports this element. Appellee, Appellant, and Canada each testified that in the past, Appellee and Appellant had engaged in serious disputes over visitation with Melissa. According to Appellee, her lawyer had suggested that Tabor adopt Melissa primarily because of a history of turmoil over visitation rights. Moreover, Appellee acknowledged that after Appellant had executed the affidavit, he never again attempted to make contact with Melissa. Appellant's testimony confirmed this fact. Likewise, the record is undisputed that neither Appellee's lawyer nor any other party ever contacted Appellant with regard to Melissa's visitation. From this evidence, we conclude that by concealing Appellant's parental status from him, Appellee intended for Appellant to cease his efforts to exercise his visitation rights with Melissa.

Finally, the fifth element requires a showing that Appellant acted on Appellee's misrepresentation to his prejudice. At the

time Appellant signed the affidavit relinquishing his parental rights, Melissa was 12 years old. By the time Appellant had actual knowledge that Melissa was still legally his daughter, Melissa had passed her 18th birthday, and Appellant's visitation rights under the Agreed Order had terminated. By virtue of Appellee's concealment of the fact that Appellant's parental rights had never, in fact, been terminated, Appellant lost the right and opportunity to enjoy his paternal relationship with his daughter. We think this loss amply satisfies the final element of the defense of estoppel.

The trial court's fact findings numbered 4, 10, 14 (as it relates to no further action being taken after filing the petition and affidavit), 15 (to the extent it provides that Appellant should have known the termination proceeding would not go through *within a short period of time* after it was filed), 16, 24, 25 and 26, are without support in the evidence. With regard to these fact findings, the evidence in support of estoppel is so strong that reasonable minds could not differ as to the existence of estoppel from the date of execution of the affidavit until October of 1986. However, we find sufficient evidence to support the trial court's fact finding number 15 from October of 1986 through May of 1988 to the extent it provided that Appellant should have known that the termination proceeding was not then completed.

We sustain Appellant's points of error pertaining to the availability of the defense of estoppel and challenging the legal sufficiency of the evidence to support the trial court's fact findings on that defense for the first 49 months following the execution of the affidavit. Having found no reversible error in the remainder of the points of error, we overrule those points without discussion.

We reform the judgment as to the award of child support arrearages accruing from September of 1982 through September of 1986 (49 months), affirm the judgment as to the award of child support payments for arrearages accruing in August of 1982 and from October 1986 through May of 1988

(21 months), and render judgment for Appellee in the amount of $2,100.