The **PROCTER & GAMBLE COMPANY**, et al.,
Plaintiffs,

v.

**AMWAY CORPORATION,**
et al., Defendants.

No. CIV.A. H–97–2384.

United States District Court,
S.D. Texas,
Houston Division.

April 26, 1999.

Michael T. Gallagher, Gallagher Lewis & Downey, Houston, TX, Richard A. Sheehy, McFall Sherwood & Sheehy, Houston, TX, W.B. Markovits, Markovits & Greiwe, Cincinnati, OH, Stanley M. Chesley, Theresa L. Groh, Paul M. De-Marco, Fay E. Stilz, Waite Schneider et al., Cincinnati, OH, for Plaintiff.

David Owen Cluck, Lorance & Thompson, Houston, TX, Charles L. Babcock, Jackson Walker, Houston, TX, Byron G. Lee, Coasts Rose et al., Houston, TX, James R. Sobieraj, Brinks Hofer Gilson and Lione, Chicago, IL, Michael A. Mohr, Sharon D. Grider, AMWAY Corp., Ada, MI, Sean M. Sullivan, Dominic P. Zanfardino, Ralph J. Gabric, Timothy Q. Delany, Richard A. Kaplan, Brinks Hofer Gilson and Lione, Chicago, IL, for AMWAY Corp.

Edward B. McDonough, Jr., McDonough & Associates, Houston, TX, William J. Abraham, Rick J. Abraham, Abraham Law Offices, Columbus, OH, for AMWAY Distributors Ass'n Council.

Robert L. DeJong, Miller Canfield Paddock & Stone, Grand Rapids, MI, Byron G. Lee, Coasts Rose et al., Houston, TX, for Ja–Ri Corp.

Byron G. Lee, Coasts Rose et al., Houston, TX, for Donald R Wilson, Wow Intern., Inc., Wilson Enterprises, Inc., Ronald A. Rummel, Randy Haugen, Freedom Associates Inc., Freedon Tools Inc., Randy Walker, Walker Intern., Inc., Dexter Yager, Birdie Yager, D & B Yager Enterprises Inc.

Warren Royal Taylor, Taylor & Taylor, Houston, TX, for Kevin Shine.

## ORDER

GILMORE, District Judge.

Pending before the Court is Amway Corporation's ("Amway's") Motion for Summary Judgment. (Instrument No. 267). Based on the parties' submissions and the applicable law, the Court finds that Amway's should be **GRANTED in PART** and **DENTED in PART**.

### I. Background

On July 17, 1997, Plaintiffs Proctor & Gamble Company and Proctor & Gamble Distributing Company ("P & G") filed this action against Amway Corporation ("Amway"), Amway Distributors Association Council ("ADA"), and several other defendants. Plaintiffs asserted claims for business disparagement, defamation, violations of the Texas Business and Commerce Code, unfair competition, violations of the Lanham Act, tortious interference with prospective business relations, negligent supervision, negligence, vicarious liability, fraud, and violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c) and (d).

P & G and Amway compete for consumers of household products such as laundry detergent and toothpaste. Amway sells its products through a multi-level distribution plan for door-to-door sales. As it argued unsuccessfully in prior Federal Trade Commission litigation, P & G argues in this case that the Amway distribution plan is an illegal pyramid scheme.

P & G alleges that since the early 1980s Amway and its distributors have circulated false statements that P & G is associated with Satanism and that profits from the sale of P & G products are contributed to the "Church of Satan." P & G claims that it complained to Amway and Amway assured P & G that the circulation of the false statements would stop. P & G maintains that, contrary to these alleged assurances, the rumors were again circulated in 1995, beginning in Texas.

P & G insists that Amway and its distributors have also issued false statements about P & G's products. As an example, P & G alleges that Amway distributors have told potential customers that P & G's laundry detergent causes "shudge" which clogs drain pipes and that P & G's toothpaste contains harmful abrasives which can damage tooth enamel.

In 1995, P & G sued Amway and one of its distributors in Utah challenging the Satanism rumors. An amended complaint filed in the Utah federal court also challenged Amway's distribution method as a pyramid scheme. The amended complaint was dismissed by the Utah Court on July 15, 1997.

On July 17, 1997, P & G sued Amway, ADA, and other distributors in this Court again challenging the Satanism rumors and the Amway distribution plan, as well as the alleged false statements which were product-specific. Most of P & G's claims are based on 148 statements allegedly made by Amway or its distributors since 1980. (Amway's Motion, Instrument No. 267, Exh. 1).

On November 12, 1998, the Court dismissed P & G's claims for unfair competition, negligent supervision, negligence, and Civil RICO. (Instrument No. 156). Consequently, the seven (7) remaining causes of action in this case are business disparagement, defamation, violation of section 16.29 of the Texas Business and Commerce Code, violations of the Lanham Act, tortious interference with prospective business relations, vicarious liability, and fraud.

On March 11, 1999, Amway filed a motion for summary judgment, asserting several challenges to all seven (7) of the remaining claims. In particular, Amway contends that a majority of the allegations underlying P & G's claims are barred by the applicable statute of limitations. Amway also maintains that it is entitled to summary judgment on its affirmative defenses of estoppel and waiver. In addition, Amway argues that a majority of the statements are not reasonably capable of a defamatory meaning. Amway also maintains that P & G's business disparagement claim must fail because the statements were either not "of and concerning" P & G or its products, not disparaging, not published with actual or common law malice, or not the sole cause of P & G's damage. Furthermore, Amway continues, section 16.29 of the Texas Business and Commerce Code is inapplicable to the allegations made by P & G.

Amway also contends that P & G's tortious interference with prospective business relations claim is meritless since P & G fails to present evidence of specific prospective relationships that did not materialize and cannot show that Amway or its distributors interfered with any prospective relationships or that they committed an intentional of malicious act. With respect to the Lanham Act, Amway asserts that the Satanism statements are not actionable because they do not misrepresent the features of any products and do not constitute commercial speech. Moreover, Amway argues that there is no definitive evidence that the challenged statements were false or misleading or that there was any deception of a substantial portion of the intended audience. Amway also argues that P & G does not have standing to sue under the Lanham Act based on the alleged pyramid scheme. Next, Amway points out that vicarious liability does not constitute an independent cause of action, but rather is a theory used to attach liability to one party for the acts of another. Amway then claims that there is no show-

ing of justifiable reliance by P & G, as required to establish fraud.

In response, P & G argues that none of its claims are barred by statute of limitations and that the disparaging statements constitute a continuing tort. In addition, P & G maintains that Amway is estopped from raising the statute of limitations defense. P & G insists that the disparaging statements concerned P & G and its products, were made with legal and actual malice, and caused P & G to suffer pecuniary loss. P & G also contends that its claims for defamation, violation of section 16.29 of the Texas Business and Commerce Code, violation of the Lanham Act, tortious interference with prospective business relations, and fraud are actionable. Lastly, P & G argues that Amway failed to prove its defenses of estoppel and waiver.

## II. Standard of Review

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56. A fact is "material" if its resolution in favor of one party might affect the outcome of the suit under governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). An issue is "genuine" if the evidence is sufficient for a reasonable jury to return a verdict for the nonmoving party. *Anderson*, 106 S.Ct. at 2510. If the evidence rebutting the motion for summary judgment is only colorable or not significantly probative, summary judgment should be granted. *Anderson*, 106 S.Ct. at 2511; *see Lewis v. Glendel Drilling Co.*, 898 F.2d 1083, 1088 (5th Cir.1990), *cert. denied*, 502 U.S. 857, 112 S.Ct. 171, 116 L.Ed.2d 134 (1991).

Under Rule 56(c) of the Federal Rules of Civil Procedure, the moving party bears the initial burden of informing the district court of the basis for its belief that there is an absence of a genuine issue for trial, and for identifying those portions of the record that demonstrate such absence. *Matsushita Elec. Ind. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1355–

56, 89 L.Ed.2d 538 (1986); *Leonard v. Dixie Well Serv. & Supply, Inc.*, 828 F.2d 291, 294 (5th Cir.1987).

Where the moving party has met its Rule 56(c) burden, the nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts ... [T]he nonmoving party must come forward with 'specific facts showing that there is a *genuine issue for trial.*'" *Matsushita*, 475 U.S. at 586–87, 106 S.Ct. at 1356 (quoting FED. R. CIV. P. 56(e)) (emphasis in original); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Leonard*, 828 F.2d at 294. To sustain the burden, the nonmoving party must produce evidence admissible at trial. *Anderson*, 477 U.S. at 255, 106 S.Ct. at 2514; *Thomas v. Price*, 975 F.2d 231, 235 (5th Cir.1992) ("To avoid a summary judgment, the nonmoving party must adduce admissible evidence which creates a fact issue....").

## III. Statute of Limitations

First, Amway argues that P & G "filed stale claims, which they have known about for years, regarding a 20–year–old Satanism rumor and allegations that Amway has, since 1959, operated an illegal pyramid." (Amway's Motion, Instrument No. 267, at 2). In addition, Amway continues, P & G alleges that "Amway's independent distributors have over the past twenty years made isolated disparaging remarks about P & G's products dating 'prior to 1982.'" (*Id.* at 2). According to Amway, P & G's claim are, for the most part, barred by limitations. Conversely, P & G maintains that its claims are not barred by the applicable statute of limitations; that the discovery rule and the continuing tort doctrine apply, and therefore the limitations period has not begun to run.

### A. Defamation

With respect to P & G's defamation claim, Amway argues that Statements 1–126 are barred by the applicable one-year statute of limitations. "Under Texas

law, limitations is an affirmative defense on which defendants have the burden of proof." *Resolution Trust Corp. v. Bright,* 872 F.Supp. 1551, 1569 (N.D.Tex.1995). "When a party moves for summary judgment on limitations, it is the movant's burden to conclusively establish the bar of limitations." *Poe v. Holiday Inns, Inc.,* 800 F.Supp. 1439, 1441 (E.D.Tex.1992). "However, where a non-movant interposes a tolling statute, the limitations defense is not conclusively established until the movant negates the applicability of the statute." *Id.* The court cannot decide an issue of material fact, but is relegated to a determination of whether a genuine issue exists. *Fusco v. Johns–Manville Prods. Corp.,* 643 F.2d 1181, 1182 (5th Cir.1981). "[W]hen the evidence conclusively shows that the cause of action has been barred by [statute of] limitations, judgment may be rendered for the proponents [of a summary judgment motion], but the *evidence must be such that reasonable men would not differ as to its interpretation." Id.* at 1182–83 (emphasis added).

P & G's "defamation claim is based on state law, and therefore, is governed by the Texas statute of limitations. Under Texas law, any defamation claim must be brought within one-year after the defamatory statements were made." *Henderson v. AT & T Corp.,* 933 F.Supp. 1326, 1331 (S.D.Tex.1996). In this case, P & G filed its complaint against Amway and others on July 17, 1997. It is undisputed that Statements 1–126 were allegedly published more than one-year before P & G filed its complaint. P & G, however, contends that a number of these statements are timely under the "discovery rule." For several of the statements, P & G indicates that the company first learned about the statement within one-year of the filing of the complaint or after P & G filed its complaint. For example, although Statement 2 was purportedly published in the early 1980's, P & G claims that it first learned about the statement on August 4, 1997—after the complaint was filed.

"The discovery rule is an exception to the general rule that a cause of action accrues when facts come into existence authorizing a claimant to seek a judicial remedy." *Ellert v. Lutz,* 930 S.W.2d 152, 156 (Tex.App.—Dallas 1996, no writ). Under the "discovery rule," the statute of limitations does not begin to run until the defamed person learns of, or in the exercise of reasonable diligence should have learned of, the allegedly defamatory statement. *Langston v. Eagle Publishing Co.,* 719 S.W.2d 612, 615 (Tex.App.—Waco 1986, writ ref'd n.r.e.). "The discovery rule applies if: (1) the injury is *inherently undiscoverable;* and (2) the evidence of the injury is objectively verifiable." *Velsicol Chemical Corp. v. Winograd,* 956 S.W.2d 529, 531 (Tex.1997) (emphasis added) (citing *Computer Assocs. Int'l, Inc. v. Altai, Inc.,* 918 S.W.2d 453, 456 (Tex. 1996)); *Ellert,* 930 S.W.2d at 156. In application, the discovery rule " 'proves to be a very limited exception to statute of limitations.' " *Ellert,* 930 S.W.2d at 156 (quoting *Altai,* 918 S.W.2d at 455); *see Johnson v. Abbey,* 737 S.W.2d 68, 69–70 (holding that the discovery rule applies to defamation that is not of public knowledge, as in a false credit report). "The determination of whether the discovery rule applies to a particular cause of action is a question of law." *Ellert,* 930 S.W.2d at 156.

In *Ellert v. Lutz,* 930 S.W.2d 152, 154 (Tex.App.—Dallas 1996, no writ), Ellert filed a gender discrimination claim in federal court against her boss, Lutz. Later, on July 18, 1994, Ellert sued Lutz in state court for defamation. *Id.* "The basis of Ellert's libel claim was a memorandum from Lutz to Jerry Robinson[,] [the director of personnel at the university,] regarding Ellert's termination." *Id.* at 155. The memorandum was dated April 5, 1991, received by Robinson on that date, and placed in Ellert's personnel file on that very same day. *Id.* The memorandum was not published at any other time outside the university. *Id.*

■ Ellert asserted that she did not see the April 5 memorandum until it was produced in the federal litigation on or about October 6, 1993, in the course of discovery. *Id.* Ellert, therefore, argued that the discovery rule prevented her libel claim from being barred by the one-year statute of limitations. *Id.* at 156. The Texas Supreme Court, however, "conclude[d] [that] the basis of Ellert's claim, the April 5 memorandum, was not inherently undiscoverable." *Id.* at 156–57. The court stated that:

> To be "inherently undiscoverable", an injury need not be absolutely impossible to discover, else suit would never be filed and the question of whether to apply the discovery rule would never arise. Nor does "inherently undiscoverable" mean merely that a particular plaintiff did not discover his injury within the prescribed period of limitations; discovery of a particular injury is dependent not solely on the nature of the injury but on the circumstances in which it occurred and plaintiff's diligence as well. *An injury is inherently undiscoverable if it is by nature unlikely to be discovered within the prescribed limitations period despite due diligence.*

*Id.* at 156 (quoting *S.V. v. R.V.*, 933 S.W.2d 1 (1996) (emphasis added)). The court reasoned that the basis of Ellert's claim was not inherently undiscoverable because "[t]he undisputed summary judgment evidence show[ed] that Ellert had easy access to her personnel file and the memorandum at all time." *Id.* at 157. Furthermore, the court continued, "Ellert was involved in administrative and judicial proceedings regarding her termination for several years after the memorandum was placed in her personnel file." *Id.*

■ In this case, P & G argues that "[i]t was unlikely that P & G would discover most of the incidents because they were statements at Amway rallies or at Amway meetings in peoples' homes." (P & G's Opposition, Instrument No. 279, at 12). According to P & G, "[u]nless a consumer calls P & G and reports the incident, it (and the injury to P & G) is virtually undetectable except through judicial discovery proceedings." (*Id.* at 12). P & G also maintains that it "exercised reasonable diligence in attempting to discover the incidents in questions." (*Id.* at 13). In the past, P & G purportedly "hired private investigators ... to attempt to track down and discover who was repeating the Satanism [r]umor." (*Id.*).

Although P & G asserts that the bases of its claim, the 148 statements, were "virtually undetectable," P & G admits that the company learned about several statements allegedly made at Amway meetings, rallies, and parties within one year of their publication. Furthermore, Ed Artzt ("Artzt"), the former Chief Executive Officer of P & G, testified that he became aware "[s]ometime between 1980 and 1990" that Amway had a significant involvement in the Satanism rumor. (P & G's Opposition, Instrument No. 279, Exh. A–14, at 34). Artzt also stated that he "had come to the conclusion, before 1990, that ... [the rumor] was having a substantial effect" on P & G's reputation with the public. (*Id.* at 35). Moreover, according to Amway, P & G has already sued Amway distributors over the Satanism rumor in 1982, 1983, 1986, 1990, and 1995. (Amway's Reply Brief, Instrument No. 292, at 4).

As mentioned, "[i]nherently undiscoverable encompasses the requirement that the existence of the injury is not ordinarily discoverable, even though due diligence has been used." *Altai*, 918 S.W.2d at 456. Based on the evidence submitted by both parties—especially, those instances where P & G discovered the disparaging statement within one year after its publication—it is clear that the existence and nature of P & G's injury was not ordinarily undiscoverable. While some disparaging remarks "might not [have] be[en] quickly discovered, this isolated fact does not alter the reality" that the defamatory statements generally were capable of detection within the time allotted for bringing suit. *See Altai*, 918 S.W.2d at 457 (holding that

trade secret misappropriation is generally capable of detection within the allotted limitations period). Thus, as in *Ellert*, the Court finds that the discovery rule does not apply because the bases of P & G's defamation claim, the 148 disparaging statements, were not inherently undiscoverable.

■ P & G then argues that "[u]nder the continuing tort/continuing injury doctrine[,] ... P & G's defamation claim is timely as to all of the 148 statements." (P & G's Opposition, Instrument No. 279, at 15 n. 13). "Texas courts first recognized the tolling concept of continuing tort in trespass to land and nuisance cases." *Twyman v. Twyman*, 790 S.W.2d 819, 820 (Tex.App.—Austin 1990), *rev'd on other grounds*, 855 S.W.2d 619 (Tex.1993). The tolling concept has since been expanded to false imprisonment cases and considered in cases involving civil rights violations. *Id.*

> A continuing tort is one inflicted over a period of time; it involves a wrongful conduct that is repeated until desisted, and each day creates a separate cause of action. A continuing tort does not accrue until the defendant's tortious act ceases. It involves not only continuing wrongful conduct, but continuing injury as well. The continuing nature of the tort is determined by the complained-of injury; there may be either a continuing injury about which the plaintiff complains, which constitutes a continuing tort, or *a single, distinct injury despite continued availment to the tort, which does not constitute a continuing tort.* Engaging in wrongful conduct that causes injury and then refusing to modify, reverse, or cease that conduct for some period of time thereafter does not constitute a continuing tort; rather, the statute of limitations begins to run when the injury is first sustained.

*Dickson Constr., Inc. v. Fidelity and Deposit Co. of Maryland*, 960 S.W.2d 845, 851 (Tex.App.—Texarkana 1997, no writ) (emphasis added). P & G does not cite and the Court has not found any Texas cases applying continuing tort to defamation.

Rather, in *Dickson Constr., Inc. v. Fidelity and Deposit Co. of Maryland*, 960 S.W.2d 845, 851 (Tex.App.—Texarkana 1997, no writ), the court held that a disparaging comment made by an employee of the Fidelity and Deposit Company of Maryland in January of 1993, and any harm that may have ensued to the plaintiff because of that comment did not constitute a continuing tort.

■ In *Wallace v. Skadden, Arps, Slate, Meagher & Flom*, 715 A.2d 873, 875 (D.C. 1998), Katherine Wallace ("Wallace") sued her former employer, Skadden, Arps, Slate, Meagher & Flom ("Skadden Arps"), and several of Skadden Arps's partners and associates, alleging that her character and professional qualifications had been defamed in a number of performance evaluations and other communications. The first sixteen counts of Wallace's complaint related to defamatory communications which the defendants allegedly made prior to November 1, 1994. *Id.* at 882. Since Wallace filed her complaint on November 1, 1995, the court determined that these counts were barred by the one-year statute of limitations. *Id.*

Wallace, however, argued that "the defendants' defamatory statements were all part of a single continuing course of conduct, and that the statute of limitations therefore did not begin to run until after the conduct ceased following her discharge." *Id.* The court disagreed with Wallace's contention, emphasizing that Wallace's complaint "allege[d] that the defendants made a number of discrete defamatory communications." *Id.* The court reasoned that each of the statements constituted a new assault on Wallace's reputation and gave rise to a separate right of action. *Id.* The court then stated that the " 'running of the statute [could not] be prevented by repetition of [defamation], although, of course, a separate action w[ould] lie for any repetition within the statutory time.' " *Id.* (quoting 53 C.J.S. *Libel and Slander* § 122, at 206 (1987)). "[O]nce the plaintiff has been placed on

notice of an injury and of the role of the defendants' wrongful conduct in causing it, the policy disfavoring stale claims ma[de] application of the 'continuous tort' doctrine inappropriate." *Id.* at 883.

In *Curtis v. Firth,* 123 Idaho 598, 850 P.2d 749, 750 (1993) (emphasis added), the court stated the following:

> It is important to note what does not constitute a continuing tort. *Wrongful acts which are separate and wholly dissimilar are separate causes of action* and the statute of limitations begins to run from the time of the commission of each wrongful act. Thus it is important to distinguish between separate acts which may be assault, *defamation,* or battery, and a continuing course of wrongful conduct which constitutes intentional infliction of emotional distress.

Here, the Court finds that the continuous tort doctrine is inapplicable to P & G's claim. P & G identified 148 different disparaging remarks allegedly made by Amway or its distributors. Thus, this case involves acts that are "complete in themselves[.]" *Twyman,* 790 S.W.2d at 821 (quoting *Franzetti v. Franzetti,* 120 S.W.2d 123, 126 (Tex.Civ.App.—1938, no writ)). Each defamatory statement gives

rise to a separate cause of action. *See Wallace,* 715 A.2d at 882.

 Therefore, P & G's allegations of defamatory remarks that were made prior to July 17, 1996, are barred by the one-year statute of limitations.[1] Only those disparaging statements that were purportedly published on or after July 17, 1996—within one year of the complaint being filed—may form the basis of P & G's defamation claim.

## B. Business Disparagement

In this case, P & G asserts both a defamation and business disparagement claim against Amway and others. Amway argues that the "Texas one-year … limitations period [for defamation] applies to all other torts asserted based on the same facts as a defamation claim." (Amway's Brief, Instrument No. 267, at 17).

 Unlike a cause of action for defamation, a suit for business disparagement must be brought within two years after the cause of action accrues. *Dwyer v. Sabine Mining Co.,* 890 S.W.2d 140, 142 (Tex.App.—Texarkana 1994, writ denied). However, an action for "business disparagement is similar in many respects to an action for defamation." *Hurlbut v. Gulf*

---

1. P & G also maintains that Amway is estopped from asserting a statute of limitations defense. In particular, P & G states that "Amway cannot be heard to argue that P & G should have sued Amway earlier[ ] because Amway induced P & G not to sue through false representations that Amway was doing everything it could to prevent its distributors from repeating the disparagement." (P & G's Opposition, Instrument No. 279, at 22). Under Texas law,

> "[e]stoppel may bar a limitations defense when a party, or its agent or representative, makes representations that induce plaintiffs to delay in filing suit within the applicable limitations period. However, the failure to file suit must be unmixed with want of diligence on the plaintiffs'[ ] part. *Plaintiffs may not continue to rely on the defendant's original inducement beyond a point when it becomes unreasonable to do so.*"

*Palais Royal, Inc. v. Gunnels,* 976 S.W.2d 837, 849 (Tex.App.—Houston [1st Dist.] 1998, no writ) (emphasis added). P & G insists that it

relied on certain assurances made by Amway in the early 1980's through the 1990's that the company "would do all in its power to prevent distributors from repeating the false and misleading statements about P & G and P & G's products." (P & G's Opposition, Instrument No. 279, at 25). P & G argues that it was the company's policy in the early 1980's to refrain from commencing litigation against Amway for these statements. Artzt, however, stated that he realized that P & G should "have gone after Amway sooner" in the "late '80s, as these rumors continued and … [P & G] got more and more lack of response from Amway." (P & G's Opposition, Instrument No. 279, Exh. A–32, at 37). Given the significant length of time, from the 1980's to the 1990's, that Amway supposedly induced P & G to delay in filing suit, the Court finds that there definitely came a point when it became unreasonable for P & G to rely on Amway's original inducements. Consequently, Amway is not estopped from asserting a statute of limitations defense.

*Atlantic Life Ins. Co.,* 749 S.W.2d 762, 766 (Tex.1987). Under Texas law, business disparagement and defamation claims

> [b]oth involve the imposition of liability for injury sustained through publications to third parties of a false statement affecting the plaintiff. The two torts, however, protect different interests. The action for defamation is to protect the personal reputation of the injured party, whereas the action for injurious falsehood or business disparagement is to protect the economic interest of the injured party against pecuniary loss.

*Id.*

> In distinguishing between personal defamation and disparagement of business, the type of damages claimed is significant. Libel or slander is actionable without proof of special damages; thus, no specific economic loss need be proved. In business disparagement and other "injurious falsehood claims," special damages are "the gist of the action," and neither damages to reputation nor consequential mental distress is recoverable.

*Gulf Atlantic Life Ins. Co. v. Hurlbut,* 696 S.W.2d 83, 97 (Tex.App.—Dallas 1985), *rev'd on other grounds,* 749 S.W.2d 762 (Tex.1987). "An injured party may sue for both personal defamation and business disparagement in the same suit so long as he avoids duplication of damages." *Dwyer v. Sabine Mining Co.,* 890 S.W.2d 140, 142 (Tex.App.—Texarkana 1994, writ denied); *Hurlbut,* 696 S.W.2d at 97.

■ Unlike Amway's contention, Texas case law does "not go so far as to hold that the one-year statute applies whenever a false statement disparaging a business interest is also personally defamatory[.]" *Hurlbut,* 696 S.W.2d at 98. Rather, "in determining whether the one-year statute applies to a defamatory or disparaging statement, a plaintiff's pleadings and proof must be examined to see whether the primary gravamen of the tort is an injury to the plaintiff's personal reputation, and whatever damages ensue from that injury, or whether the gravamen is a direct injury to the plaintiff's business or property." *Id.*

> [I]f the main complaint is a false statement directly injurious to a business or property interest, and the damages alleged and proved are limited to a business or property losses established with the specificity required for these sorts of damages, then the claim may properly be considered as one for business or property disparagement, even though aspects of personal defamation may be incidentally involved.

*Id.*

■ In *Cain v. Hearst Corp.,* No. H–93–614, 1993 WL 304412, *1 (S.D.Tex. 1993), an unpublished opinion relied on by Amway, the plaintiff brought suit against the Houston Chronicle Publishing Company, arguing that an article in the June 30, 1991 issue of the Chronicle newspaper placed him in a "false light." According to the plaintiff, the article referred to him as a member of the "Dixie Mafia" and stated that he was "believed to have killed as many as eight people." *Id.* The plaintiff claimed that the article caused "him to suffer depression, mental anguish and distress, dejection and severe humiliation." *Id.* The court concluded that "irrespective of what the plaintiff may call his suit, it [wa]s nevertheless, a suit in libel" which had to be "brought within one year of the offending act." *Id.* Since the offending act occurred on June 30, 1991, and the plaintiff filed his suit on January 6, 1993, the court found that the plaintiff's claim was barred by the one-year limitations period. *Id.*

Likewise, in *Gulf Atlantic Life Ins. Co. v. Hurlbut,* 696 S.W.2d 83, 93–99 (Tex. App.—Dallas 1985), *rev'd on other grounds,* 749 S.W.2d 762 (Tex.1987), the court held that any recovery allowed for the plaintiffs' business disparagement claim was barred by the one-year statute of limitations for defamation as matter of law. In *Hurlbut,* the plaintiffs alleged that false information "charg[ing] ... [them] with fraud and the crime of selling unapproved insurance" that was published

by the defendants caused the plaintiffs' licenses to be revoked and caused indictments to be returned against them. *Id.* at 93. Furthermore, the plaintiffs continued, the false information caused them to be held up to public ridicule and contempt and branded as common criminals. *Id.*

The plaintiffs brought several claims against the defendants based on the alleged defamatory utterances, including business disparagement, tortious interference with contract rights, fraud, and conspiracy to engage in such tortious conduct, and sought damages for lost earnings, injury to their reputation, emotional distress, and lost property. *Id.* 87, 93. "The trial court rendered judgment for actual and exemplary damages against all defendants." *Id.* at 87.

The defendants then appealed the trial court's judgment, arguing that all of the claims were barred by the statute of limitations. *Id.* The court of appeals agreed and reversed the judgment of the trial court. *Id.* In particular, the court of appeals determined that the plaintiffs' business disparagement "suit ha[d] been pleaded as a slander case, proved as a slander case, and submitted to the jury as a slander case, with only formal use of the term 'business disparagement' instead of slander." *Id.* at 99.

The court of appeals stated that the statements "were defamatory to the plaintiffs' characters and reputations personally rather than merely disparaging to their business." *Id.* at 95. In other words, the "injury alleged and proved ... [wa]s a general injury to each plaintiff's personal reputation resulting from charges of fraudulent and criminal conduct rather than special injury to their business." *Id.* at 98. The court of appeals reasoned as follows:

> Plaintiffs claimed, proved, and recovered all damages that would be recoverable in an action for personal defamation. Specifically, those damages included damages to personal reputation, alienation of friends, humiliation, and mental distress, none of which are damages allowed by law for business disparagement. Such

pecuniary loss as was proved was loss of earnings in general by the individual plaintiffs rather than loss of profits from the particular business they were carrying on together.

*Id.* at 99.

Consequently, the court of appeals concluded that the plaintiffs' business disparagement claim was barred by the one-year limitations period for defamation. *Id.* at 95. On appeal, the Texas Supreme Court "agreed ... that the damages proven were personal to the plaintiffs." *Hurlbut,* 749 S.W.2d at 766–67 (finding no reversible error in the judgment of the court of appeals as it pertained to the plaintiffs' business disparagement claim).

On the other hand, in *Dwyer v. Sabine Mining Co.,* 890 S.W.2d 140, 143 (Tex. App.—Texarkana 1994, writ denied), the court recognized that the plaintiff had asserted two distinct causes of action—defamation and business disparagement. The plaintiff claimed that several defamatory statements made by the defendants on July 13, 1991, caused a potential client to terminate contract negotiations with the plaintiff. *Id.* at 142. The plaintiff filed his original petition alleging defamation on September 4, 1992, and amended his complaint to add a claim for business disparagement on June 28, 1993. *Id.* The plaintiff "said that the statements sabotaged the prospective contract he had ... and deprived him of commissions." *Id.*

The court determined that the plaintiff's defamation claim was barred by the one-year limitations period. *Id.* at 143. However, "although limitations barred his claim for defamation," the court found that the plaintiff had "at least raised a fact issue on his claim for special damages because of business disparagement, and [that] limitations ha[d] not barred that claim." *Id.* The court reasoned that the plaintiff sought damages for injuries resulting from his loss of the contract, loss of business relationships, and his loss of commissions and pleaded special damages caused by the tortious interference. *Id.*

Unlike the plaintiffs in *Cain* and *Hurlbut*, P & G has alleged economic loss (lost sales) to the company as well as other damages (injury to reputation, goodwill, and prestige) as a result of the 148 disparaging statements. In particular, P & G claims that:

> [t]he utterance and/or publication of the false, malicious, non-privileged statements by Defendants induced others not to conduct business with ... [P & G], and/or to cease purchasing ... [P & G's] products, which proximately caused special damage, including but not limited to, loss of trade, lost sales, lost revenue, and harm to ... [P & G's] reputation, goodwill and prestige and standing with consumers or customers in the business community.

(Complaint, Instrument No. 86, ¶ 103). According to P & G, "the great majority of P & G's injuries are lost sales, precisely the 'loss of business' that fits within the business disparagement [claim]." (P & G's Opposition, Instrument No. 279, at 5). Having alleged a direct injury to P & G's business, the Court finds the holdings in *Cain* and *Hurlbut* to be inapplicable. Instead, as in *Dwyer*, the Court concludes that P & G has asserted two distinct causes of action against Amway and the other defendants—defamation and business disparagement.

As mentioned, "an injured party may sue for both torts in the same suit so long as he avoids duplication of damages." *Hurlbut*, 696 S.W.2d at 98. "[I]f the defamation claim is barred because of its shorter limitation period, the disparagement claim will not be barred by the shorter limitation period so long as the injured party does not plead allegations and proof typical of an action for defamation." *Id.* General damages for injury to personal reputation, humiliation and mental anguish are typical of an action for defamation. *Id.* Whereas, specific damages to a particular business or property are typical of a claim for business disparagement. *See id.* As in *Dwyer*, P & G clearly alleges damage to its business, including lost sales and revenue. Thus, P & G asserts a separate claim for business disparagement against Amway and the other defendants which is not subject to the one-year limitations period for defamation.

As mentioned, a suit for business disparagement must be brought within two years after the cause of action accrues. *Dwyer*, 890 S.W.2d at 142. P & G insists that the discovery rules applies to its claim for business disparagement and that the 148 statements "that neither occurred nor were discovered within two years of filing of the [c]omplaint arc actionable as part of a continuing course of tortious conduct." (P & G's Opposition, Instrument No. 279, at 13). For the same reasons that the Court concluded that the discovery rule and the continuous tort doctrine were inapplicable to P & G's defamation claim, the Court finds that these tolling provisions do not apply to P & G's business disparagement claim. Consequently, only those disparaging statements that were purportedly published on or after July 17, 1995—within two years of the complaint being filed—may form the basis of P & G's business disparagement claim to the extent that P & G's damages are not duplicated.

### C. Section 16.29 of the Texas Business and Commerce Code

Under Section 16.29, "[a] person may bring an action to enjoin an act likely to injure a business reputation or to dilute the distinctive quality of a mark registered under ... Title 15, U.S.C., ... regardless of whether there is competition between the parties or confusion as to the source of goods or services." Tex. Bus. & Com. Code § 16.29 (West 1998). "The general limitations period for torts in Texas is two years[.]" *Derrick Manu. Corp. v. Southwestern Wire Cloth. Inc.*, 934 F.Supp. 796, 804 (S.D.Tex.1996); Tex. Civ. Prac. & Rem. Code § 16.003(a) (West 1998). Amway, however, argues that several of the 148 statements that form the basis of P & G's cause of action under Section 16.29 of the Texas Business and Commerce Code are barred by the one-year

limitations period for defamation. In support of this contention, Amway cites *Cain, Hurlbut,* and *Martinez v. Hardy,* 864 S.W.2d 767 (Tex.App.—Houston [14th Dist.] 1993, no writ). The Court, however, finds these cases to be inapplicable to P & G's claim under Section 16.29.

As discussed above, *Cain* involves the court's comparison of the plaintiff's "false light" cause of action to a defamation claim. *Hurlbut* concerns the court of appeal's decision that the plaintiffs' business disparagement suit was, in actuality, a defamation claim. Lastly, in *Martinez,* the court held that the plaintiff's tortious interference with contract claim was barred by the one-year limitation period for defamation. 864 S.W.2d at 776. The court reasoned that the plaintiff's "claim for tortious interference with contract [wa]s inextricably intertwined with and dependent upon her claim for slander[.]" *Id.*

However, none of these cases cited by Amway held that the one-year limitations period for defamation should be applied to a cause of action under Section 16.29. Amway does not provide and the Court has not found any Texas cases in which the one-year statute of limitations was applied to a claim under Section 16.29. Consequently, the Court finds that Amway has not met its burden of proving that the one-year limitations period applies to this claim. Therefore, the two year limitations period applies to P & G's claim under section 16.29. As a result, P & G's cause of action under Section 16.29 is necessarily limited to those statements made within two years from the time suit was filed—i.e., those statements published on or after July 17, 1995.

### D. Tortious Interference With Prospective Business Relations

As with P & G's other claims, Amway contends that a majority of the alleged statements are barred by the one-year limitations period for defamation. Unlike the case law for causes of action under section 16.29, there is clear authority applying the one-year limitations period for defamation suits to claims for tortious interference.

In *Moore & Assocs. v. Metropolitan Life Ins. Co.,* 604 S.W.2d 487, 489 (Tex.Civ. App.—Dallas 1980, no writ), an association of anesthesiologists filed suit against Metropolitan Life Insurance Company ("Metropolitan"), a group medical insurer, for defamation, libel and tortious interference with the doctor-patient relationship. Metropolitan allegedly sent letters to several former patients of the plaintiff. *Id.* "The letters advised the patients that their claims for medical services furnished by [the] plaintiff would not be paid in full because [the] plaintiff's charges were excessive." *Id.*

With respect to the affirmative defense of limitations, the court first concluded that those letters published more than one-year prior to the date suit was filed were barred by the one-year limitation period for libel and slander. *Id.* at 491. The court then determined that the plaintiff's "claims for tortious interference with the doctor-patient relationship [we]re based on the alleged false and defamatory character of the communications complained of, and therefore, [we]re indistinguishable from the claims for libel." *Id.*

Likewise, this Court finds that P & G's tortious interference with prospective business relations claim is indistinguishable from its claim for defamation. In particular, P & G asserts that Amway "intentionally engaged in the foregoing non-privileged wrongful conduct which interfered with ... [P & G's] business relationships." (Complaint, Instrument No. 86, ¶ 139). According to P & G, "[t]he foregoing are *false and misleading statements,* constitute unfair competition, and unfair and deceptive trade practices and tortiously interfere with the business relations that ... [P & G] ha[s] with customers and consumers, including but not limited to, Amway distributors." (*Id.*) (emphasis added). Consequently, the same one-year limitation period applies and P & G's tortious interference claim is necessarily limited to those defamatory statements made within one year from the time suit was filed. *See*

*Martinez*, 864 S.W.2d at 776 (holding that one-year limitation period applied to plaintiff's tortious interference claim that was inextricably intertwined with and dependent on her slander claim); *Laird v. Texaco, Inc.*, 722 S.W.2d 519 (Tex.App.—Beaumont 1986, no writ); *Moore & Assocs.*, 604 S.W.2d at 491.

In arguing that the general two year limitations period for torts is applicable, P & G emphasizes that its tortious interference claim is based not only on the 148 defamatory statements, but also on Amway's "operation of an illegal pyramid as a fraudulent marketing scheme." (P & G's Opposition, Instrument No. 279, at 47). P & G cites Paragraph 137(c) of its complaint as support for this contention. However, Paragraph 137(c) does not discuss Amway's alleged operation of an illegal pyramid scheme, but rather identifies additional customers and consumers with whom P & G purportedly had an existing or potential economic relationship. Thus, the one-year statute of limitations applies to P & G's tortious interference cause of action and only those disparaging statements that were purportedly published on or after July 17, 1996, may form the basis of this claim.

### E. Section 43(a) of the Lanham Act

 Next, Amway insists that the one-year statute of limitations for defamation applies to P & G's claim under Section 43(a) of the Lanham Act. As with Amway's argument concerning P & G's cause of action under Section 16.29, there is no authority applying the one-year limitations period for defamation to a claim under the Lanham Act. Consequently, the Court declines to hold that the one-year statute of limitation applies to P & G's cause of action under Section 43(a) the Lanham Act.

 In the alternative, Amway argues that several of the statements alleged by P & G are barred by the applicable four year limitations period. The Court agrees. Section 43(a) of the Lanham Act "protects against misrepresentations or false state-

ments made in connection with the advertising and marketing of good or provision of services, misappropriation of the efforts of others, confusion or likelihood of confusion as to source, sponsorship, or association of goods or services." *Derrick Mfg. Co.*, 934 F.Supp. at 804. "The large majority of federal courts that have considered the limitations issue as to Section 43(a) claims have held that these claims are most comparable to fraud claims, and have applied the fraud limitations period." *Id.* Therefore, this Court holds that the fraud limitations period applies to P & G's Section 43(a) claims. *See id.* at 805. "In Texas, the limitations period for fraud is four years." *Id.* (citing Tex. Civ. Prac. & Rem. Code § 16.004 (West 1998)). Only those disparaging statements that were purportedly published on or after July 17, 1993, may form the basis of P & G's Section 43(a) claim.

### F. Fraud

Lastly, Amway maintains that P & G's fraud claim is barred by the applicable four year statute of limitations. With respect to its fraud claim, P & G asserts that "Amway made or caused to be made ... knowing and fraudulent misrepresentations of material facts to ... [P & G] that Amway would stop the spread of the Satanic Message within its organization and other false and disparaging statements made against ... [P & G] by Amway distributors." (Complaint, Instrument No. 86, ¶ 174). In particular, P & G lists a letter sent by Eugenie M. Rogstad, an Amway staff attorney, on September 8, 1980, and a letter sent by Casey Wondergram, Amway's Director of Public Relations, on April 30, 1982, and correspondence written by Thomas Laco, P & G's Executive Vice President, dated March 22, 1983, as evidence of Amway's fraudulent conduct. In its brief, P & G discusses additional statements made by Amway's personnel throughout 1982. According to P & G, "the representations continued through 1990" and "the assurances were repeated through August 1995 when Am-

way publicly pledged that its purported assistance to P & G in stopping the rumor would continue." (P & G's Opposition, Instrument No. 279, at 24).

 As mentioned, the statute of limitations for fraud claims is four years. *Jackson v. Speer,* 974 F.2d 676, 679 (5th Cir.1992); *Derrick Mfg. Corp.,* 934 F.Supp. at 804; Tex. Civ. Prac. & Rem. Code § 16.004 (West 1998).

If, however, the injured party is not aware of the fraud or the fraud is concealed, the statute of limitations begins to run from the time the fraud is discovered or could have been discovered by the defrauded party's exercise of reasonable diligence. *Knowledge of facts that would lead a reasonably prudent person to make inquiry which would lead to a discovery of the fraud is knowledge of the fraud itself.*

*Jackson,* 974 F.2d at 679 (emphasis added).

P & G argues that its fraud claim is not barred by the four-year limitations period because the company "did not know of the fraud and continued to rely on Amway's assurances until 1996, well within four years of the filing of the Complaint in July 1997." (P & G's Opposition, Instrument No. 279, at 25). In particular, P & G states the following:

P & G relied upon Amway's false assertions that it would do all it could to assist P & G in refraining from commencing litigation against Amway until 1996. Beginning in the early 1980s, it was P & G's policy to refrain from asserting a claim against Amway for the false and misleading statements made by Amway's distributors about P & G. P & G's policy of forbearance was in reliance on, and based upon, the assurances made by Amway management to P & G from 1980 into the 1990s that Amway would do all in its power to prevent its distributors from repeating the false and misleading statements about P & G and P & G's products. P & G's policy of

forbearing from litigation against Amway continued until the Spring of 1996. (*Id.*).

According to P & G, the company "first suspected that the representations made by Amway ... were false in or about July 1995, when it discovered that Defendant Haugen was a member of the Executive Committee of the ADA[ ] and agent of Amway." (Complaint, Instrument No. 86, ¶ 177). Haugen purportedly. "transmitted the Satanic Message via the Amvox system to thousands of his downline distributors." (*Id.* at ¶ 72). John E. Pepper ("Pepper") testified that after this incident, P & G was not able to rely on Amway to handle the situation in good faith. (P & G's Opposition, Instrument No. 279, Exh. A–34, at 124). Pepper stated that:

[t]o have this happen again, after all the discussion that had gone on, and have a leading member of this—of your corporation or on this council participate in a rumor going out, with his knowledge of what had gone before, you know, it—you just—it really left us feeling very hopeless in being able to get this thing controlled by the Amway Corporation and by these folks. It's not like it was a new subject.

(*Id.*). In the spring of 1996, P & G claims that the company discontinued its usual "policy of forbearing litigation against Amway[.]" (P & G's Opposition, Instrument No. 279, at 25).

However, other testimony suggests that, in the exercise of reasonable diligence, P & G could have discovered the fraud in the late 1980s. John G. Smale, P & G's Chief Executive Officer from 1981 to 1986, testified as follows:

Q. [Amway's counsel] Okay. Were you satisfied with the way the Proctor & Gamble responded to the [S]atanism rumor over the years?

A. [Smale] Satisfied in the sense of whether we should have done less or more or what?

Q. Yes.

A. I don't understand what you mean.

Q. Right, okay. Fair enough. It was a vague question. Yeah, if you had to do it all over again, would you do anything differently?

A. We sure would at this point in time. We would be going after Amway a hell of a lot sooner than we did. I mean, you know, that's pretty self-evidence at this point.

Q. Why didn't you go after Amway sooner?

A. Well, because the feeling—we just didn't initially believe that there was an attempt by that company to propagate this rumor. And, initially, I didn't know the people who headed it, but one of our executives did, Tom Laco, and he thought well of them. And there were contacts with Amway from the early stages because of the identification of Amway agents doing this.

*And so—and we got the response that they were concerned about it, and they would try to stop it. But, nothing ever happened. I mean, it just went on over period of years. So, with hindsight, yes, we would have, I think, certainly changed that aspect of it, but we didn't.*

Q. When did you first come to the realization that you should have gone after Amway sooner?

A. *I don't—I suspect in the—I don't know, towards the late '80s, as these rumors continued and as we got more and more lack of response from Amway.*

(P & G's Opposition, Instrument No. 279, Exh. A–32, at 36–37) (emphasis · added). Later, Smale stated the following:

Q. [Amway's counsel] . . . But, if I understand your testimony, initially you were satisfied with the response of Amway Corporation, but by the late 1980s, you felt you should have sued them or taken action against them sooner. My question is: Was there an earlier time, the mid-'80s, at which you became dissatisfied with the response of Amway Corporation?

A. [Smale] Well, *I think we were dissatisfied on a continuing basis.* That is, we would be—initially the feeling was, well, we're going to try to put a stop to this, but it kept going on and on. And so, I don't think there was a specific point in time. It just seemed that it just didn't stop. It just kept going on and on.

(*Id.* at 56).

In response, P & G does not offer any competent summary judgment evidence disputing that fact that, had P & G exercised reasonable diligence, the company could have known about Amway's allegedly fraudulent conduct at least by the late 1980s. Instead, P & G emphasizes its policy of refraining from initiating litigation against Amway and the company's decision to rely on Amway's assurances. Apparently, P & G became completely dissatisfied with Amway's lack of effort to eliminate the rumor when P & G learned about Haugen's purported "widespread dissemination of the Satanism [r]umor on Amway's Amvox system." (P & G's Opposition, Instrument No. 279, at 26). This explains what activity precipitated P & G to file suit against Amway for fraud, but does not suggest that P & G could not have known about Amway's fraudulent conduct in the late 1980s had the company exercised reasonable diligence.

As indicated by Smale, even though Amway gave P & G repeated assurances that it would assist in dispelling the rumor, the rumor allegedly continued to spread to P & G's existing and potential consumers and customers. In the late 1980s, P & G could have exercised reasonable diligence and discovered that Amway "had done little or nothing to stop its distributors from making the aforesaid false statements about" P & G and its products. (Complaint, Instrument No. 86, at ¶ 177). Even in the light most favorable to P & G, the Court, therefore, finds that Amway has proven as a matter of law that there is no genuine issue of material fact about when P & G could have known about Amway's fraudulent conduct in the exercise of reasonable diligence. "[T]he evidence . . . [is]

such that reasonable men would not differ as to its interpretation." *Fusco*, 643 F.2d at 1183. P & G's fraud claim is DISMISSED as it is barred by the four-year statute of limitations.

## IV. Estoppel

In addition to its affirmative defense of limitations, Amway argues that P & G is estopped from claiming that Amway is liable for Satanism statements made by Amway distributors. According to Amway, at a meeting in March of 1983, P & G agreed that "Amway's role in addressing the rumor among distributors would be to 'track them down and try to stop them if [P & G] would tell [Amway] the particulars of the incidents coming to [P & G's] attention' and that P & G would contact Amway periodically to pass on further incidents." (Amway's Brief, Instrument No. 267, at 47–48). Amway purportedly relied on this agreement and believed that it was doing what needed to be done to deal with the Satanism rumor.

In order to prove the affirmative defense of estoppel, Amway must establish five elements: (1) a false representation or concealment of material facts, (2) made with knowledge, actual or constructive, of those facts, (3) to a party without knowledge, or the means of knowledge, of those facts, (4) with the intention that it should be acted on, and (5) the party to whom it was made must have relied or acted on it to its prejudice. *LaRue v. LaRue*, 832 S.W.2d 387, 392 (Tex.App.—Tyler 1992, no writ). Since Amway bears the burden of proof on its defense of estoppel, it must establish all elements of the defense to prevail on summary judgment. *See United States v. Home Health Agency*, 862 F.Supp. 129, 133 (N.D.Tex.1994).

Amway, however, does not even discuss how the defense of estoppel applies to the facts in this case. It simply asserts that there was some alleged agreement between Amway and P & G to disclose incidents involving the rumor so that Amway could act accordingly. Amway does not suggest that any of P & G's statements in the March 1983 meeting were false or that Amway relied on this alleged agreement to its prejudice. Consequently, the Court finds that Amway fails to establish its affirmative defense of estoppel as a matter of law.

## V. Waiver

Next, Amway maintains that P & G waived its pyramid allegations under its Lanham Act cause of action. According to Amway, during discovery in lawsuits filed by P & G against Amway's distributors in the 1980s, P & G interrogated several Amway distributors about Amway business structure and methods. P & G also allegedly collected information on Amway's business structure and methods between 1982 and 1990. Furthermore, one of P & G's counsel purportedly referred to Amway's business structure as a "pyramid-type organization" in 1986. (Amway's Brief, Instrument No. 267, at 49).

As with the affirmative defense of estoppel, Amway must establish all of the element of waiver in order to prevail on summary judgment. *See Home Health Agency*, 862 F.Supp. at 133. Under Texas law,

[t]he affirmative defense of waiver can be asserted against a party who intentionally relinquishes a known right or engages in intentional conduct inconsistent with claiming that right.... A party's express renunciation of a known right can establish waiver. Silence or inaction, for so long a period as to show an intention to yield the known right, is also enough to prove waiver.

*Tenneco, Inc. v. Enterprise Products Co.*, 925 S.W.2d 640, 643 (Tex.1996). "Waiver is ordinarily a question of fact[,]" but "[w]here the facts and circumstances are admitted or clearly established ... the question becomes one of law." *Id.*

In this case, there is no evidence that P & G intentionally relinquished its right to bring suit against Amway for engaging in an illegal pyramid scheme. P &

G's opportunity to investigate Amway's structure and business methods and one attorney's reference to Amway's structure as a "pyramid-type organization" in 1986 followed by years of inaction by P & G does not prove that P & G intentionally yielded its right to sue Amway for allegedly operating a pyramid scheme. Furthermore, P & G emphasizes that there is no showing by Amway that P & G knew that Amway was an illegal pyramid scheme in the 1980s. The Court, therefore, concludes that based on the record Amway cannot establish its affirmative defense of waiver as a matter of law.

## VI. P & G's Remaining Claims

In addition to the affirmative defenses discussed above, including statute of limitations, estoppel, and waiver, Amway presents several arguments as to why P & G's remaining claims must fail as a matter of law.

### A. Defamation

■ First, Amway maintains that P & G's defamation claim is not actionable because P & G is libel proof as a matter of law. Under Texas law.

> [i]t has long been the rule … that the plaintiff's tarnished reputation may be shown in mitigation of damages. The libel-proof plaintiff doctrine is the logical conclusion to be drawn from the principle underlying that rule: where there is no reputation it cannot be damage[d] and without damage to reputation there is no actionable defamation.

*Finklea v. Jacksonville Daily Progress,* 742 S.W.2d 512, 517 (Tex.App.—Tyler 1987, writ dism'd w.o.j.). "The libel-proof doctrine," which is based on the premise that defamation is not actionable without damage to the plaintiff's reputation, was first announced in *Cardillo v. Doubleday & Co., Inc.,* 518 F.2d 638 (2d Cir.1975). A libel proof plaintiff, by definition, has "suffered minimal, if any, damage to his reputation by a defamatory communication." *Langston v. Eagle Publishing Co.,* 719 S.W.2d 612, 621 (Tex.App.—Waco 1986, writ ref'd n.r.e.). "The libel-proof doctrine

has developed into two distinct pathways." *Id.* The first path, called "issue-specific," "bars libel claims of plaintiffs who have tarnished reputations on particular issues or on a specific behavior." *Id.* The second path, referred to as the "incremental" approach, "requires the court to evaluate the defendant's communication in its entirety and to consider the effects of the challenged portion of the communication on the plaintiff's reputation in the context of the entire communication." *Id.* at 622.

■ "The cases that most compellingly invite … [the application of the libel-proof doctrine] are those cases … in which criminal convictions for similar behavior to that alleged in the challenged communication are urged as a bar to the claim." *Finklea,* 742 S.W.2d at 515. "[A] substantial majority of the reported cases [probably] relate to the specific issue of the plaintiff's criminal conduct." *Id.* Thus, "it is clear that the doctrine should have only a limited application[.]" *Id.* at 516. Under Texas law,

> [t]o justify applying the doctrine, the evidence of record must show not only that the plaintiff engaged in criminal or antisocial behavior in the past, but also that his activities were widely reported to the public. The evidence on the nature of the conduct, the number of offenses, and the degree and range of publicity received must make it clear, as a matter of law, that the plaintiff's reputation could not have suffered from the publication of the false and libelous statement.

*McBride v. New Braunfels Herald–Zeitung,* 894 S.W.2d 6, 10 (Tex.App.—Austin 1994, writ denied). "There are few so impure that cannot be traduced. Although a person's general reputation may be so bad as to render him libel-proof on all matters, ordinarily even the public outcast's remaining good reputation is entitled to protection." *Finklea,* 742 S.W.2d at 516.

■ Here, Amway contends that P & G's reputation prior to the publication of the allegedly defamatory statements was

so deplorable that the statements could not have further injured P & G's reputation. For example, Amway discusses a book written by Alecia Swasy ("Swasy") in 1993 entitled *Soap Opera* in which Swasy criticizes P & G's treatment of its female employees and accuses P & G of manipulating and abusing it employees, consumer and competitors. In addition, Amway offers an editorial from the August 13, 1991 edition of the *Wall Street Journal* that protested P & G's "use of the local police to root out the source of news leaks." (Amway's Brief, Instrument No. 267, at 13). Lastly, Amway references a 1997 article in Forbes that examines P & G's purported attempts to " 'financially paralyze' . . . [its competitor] with 'predatory' behavior[.]' " *Id.* at 14 (quoting Robert Lenzer, *The Battle of the Bottoms*, FORBES, Mar. 24, 1997, at 101).

In response, P & G maintains that Amway's evidence only consists of "unproven, hearsay, largely from newspaper articles." (P & G's Opposition, Instrument No. 279, at 20–21). P & G also provides the Court with a list of awards bestowed upon P & G in 1998, including Fortune Magazine's 100 Best Companies to Work for in America, Second Harvest's Donor of the Year, and the National Society of Black Engineers's Number 1 in Recruiting and Retention.

In the light most favorable to P & G, the Court finds that Amway has not proven that P & G is libel-proof as a matter of law. *See McBride*, 894 S.W.2d at 10–11. The evidence presented by Amway does not conclusively show that P & G engaged in criminal or anti-social behavior in the past or that P & G's alleged activities were widely reported to the public. One Texas court stated that "[a] kernel of truth and common sense underlies the libel-proof

doctrine: the reputation of an Adolph Hitler or Charles Manson could not be damaged as a matter of law, and therefore a court's time and resources should not be expended in litigating their spurious libel claims." *Langston*, 719 S.W.2d at 623. In this case, the evidence does not establish that P & G is an entity with an equally deplorable reputation; therefore, "the libel-proof doctrine should not be invoked in furtherance of judicial-economy." *Id.*

■ Thus, the Court will now examine the merits of P & G's defamation claim. Having already determined that the one-year statute of limitations for defamation bars Statements 1–126, the Court will only consider Statements 127–148.[2]

■ Defamation takes two forms: slander and libel. *AccuBanc Mortgage Corp. v. Drummonds*, 938 S.W.2d 135, 147 (Tex.App.—Fort Worth 1996, writ denied). "Slander is a false oral statement that is published to a third person without legal excuse, which refers to an ascertainable person. Libel is written or printed defamation." *Id.; Delta Air Lines, Inc. v. Norris*, 949 S.W.2d 422, (Tex.App.—Waco 1997, writ denied). "A cause of action for libel accrues when one publishes a false defamatory statement of fact of and concerning another and the one publishing the statement was at fault." *Abbott v. Pollock*, 946 S.W.2d 513, 519 (Tex.App.—Austin 1997, writ denied). Therefore, in general, "to recover on a claim for defamation, the plaintiff must prove the defendant published a false defamatory statement to a third-party about the plaintiff." *KTRK Television v. Felder*, 950 S.W.2d 100, 105 (Tex. App.—Houston [14th Dist.] 1997, no writ).

---

**2.** P & G argues that "Amway is liable for all republications of the [S]atanism [r]umor that have occurred since 1979[ ] because . . . Amway's agents first uttered the rumor." (P & G's Opposition, Instrument No. at 15). P & G then cites the Section 576 of the Second Restatement of Tort as support for the proposition that "a person who utters a defamatory statement is liable for any intended or reason-

ably foreseeable repetitions of the statement by third parties." (*Id.* at 17). However, P & G does not provide the Court with any Texas case law suggesting that a plaintiff may circumvent the statute of limitations and hold a defendant liable for defamatory remarks, that are otherwise barred, simply because the defendant originally published the defamatory statements.

"A statement is defamatory if the words tend to injure a person's reputation, exposing the person to public hatred, contempt, ridicule, or financial injury[,]" *Norris,* 949 S.W.2d at 426, or "to impeach that person's honesty, integrity, or virtue[,]" *Abbott,* 946 S.W.2d at 519. "Publication of defamatory words means to communicate orally, in writing, or in print to a third person capable of understanding their defamatory import and in such a way that the third person did so understand." *Abbott,* 946 S.W.2d at 519; *Drummonds,* 938 S.W.2d at 147. A person need not be expressly mentioned in a defamatory remark to be liable for defamation. *See Lozano v. Lozano,* 983 S.W.2d 787, 793 (Tex.App.—Houston [14th Dist.] 1998, n.w.h.).

"To be entitled to summary judgment, the person accused of making such remark has the negative burden to prove the absence of at least one of these elements, for example, that no statement was made, that the statement complained of was not defamatory, ... that the statement was not published[,]" or the absence of any resulting harm or injury. *Abbott,* 946 S.W.2d at 519; *WFAA–TV. Inc. v. McLemore,* 978 S.W.2d 568, 571 (Tex.1998). "[F]or the purposes of determining this motion only, it may be assumed that the appellations complained of ... were untrue." *H.O. Merren & Co. v. A.H. Belo Corp.,* 228 F.Supp. 515, 517 (N.D.Tex.1964) (citation omitted).

In this case, Amway argues that "Statements 127–128, 130, 131, and 134–148 are not actionable because the record shows there is no genuine issue of material fact that Amway or an Amway distributor was the publisher of the statements or that the statements were made to an identified person[.]" (Amway's Brief, Instrument No. 267, at 6). P & G identifies the publisher of Statements 127, 128, 130, 134–145, and 146–148 as an "[u]nknown Amway distributor." (Amway's Brief, Instrument No. 269, Exh. 1). P & G indicates that the person to whom Statements 131 and 138–148 were published is

unknown. (*Id.*). With respect to Statement 145, P & G provides that the publisher is "[a]lleged to be Amway Corp." (*Id.* at 38). For Statements 138–147, P & G states that the place of publication is unknown.

In response, P & G contends that the incidents involving "unknown Amway distributors" are actionable since P & G identifies the individual as agents of Amway and because "Amway did not provide the documents regarding many of the incidents to P & G at all, or until years after the defamatory statements were made." (P & G's Opposition, Instrument No. 279, at 20). P & G does not respond to Amway's other concerns.

In *Abbott v. Pollock,* 946 S.W.2d 513, 515–16 (Tex.App.—Austin 1997, writ denied), several former employees of the Burnet County Sheriff's Department brought suit against the county and the newly-elected sheriff who did not rehire the employees once the former sheriff's term had expired. The plaintiffs asserted claims for breach of contract, defamation, tortious interference with a contract, and negligent misrepresentation. *Id.* at 516. In particular, Plaintiff Wille "alleged two specific incidents of defamation. First, he alleged [that] he was publicly accused on wrecking a patrol car." *Id.* at 519. The court noted that the summary judgment evidence showed that Plaintiff Wilie did not know who made the accusation. *Id.* Wilie "only presume[d] that a representative of Burnet County or ... [the newly-elected sheriff] made the accusation." *Id.* Then, Plaintiff Wilie claimed that the newly-elected sheriff told an unidentified person, "I wonder what Mr. Wilie was involved in Burnet County." *Id.* Rather than dismissing Plaintiff Wilie's defamation claim based on his failure to identify the speaker or the third party who heard the statement, the court concluded that neither statement had a defamatory meaning. *Id.* at 520.

Also in *Abbott,* Plaintiff Pearson "based her defamation claim on a telephone con-

versation with [the] Chief Deputy ... during which he told ... [her that] she 'almost got some officers killed.'" *Id.* at 520. "While [Plaintiff] Pearson identified the person who made the statement, the summary judgment evidence show[ed] [that she] d[id] not know if the statement [had been] heard by or published to a third party." *Id.* Consequently, the court held that the defendants proved the absence of publication to a third party. *Id.*

In *Henderson v. AT & T Corp.*, 933 F.Supp. 1326, 1329–31 (S.D.Tex.1996), two female employees brought employment discrimination and defamation suits against their former employer. Plaintiff Bryan's defamation claim was based on statements contained in a negative performance appraisal that she received in January of 1994. *Id.* at 1331. The statement in the appraisal was made in March of 1993. *Id.* Since Plaintiff Bryan brought her defamation suit on August 16, 1995, the court determined that her claim was clearly time-barred. *Id.* at 1331–32. In addition the court stated that "absent [the] identification of specific instances of publication of the performance appraisal after August 16, 1994, [Plaintiff] Bryan's *vague assertions of possible but unknown instance of re-publication* are insufficient to avoid summary judgment." *Id.* at 1332 (emphasis added).

As in *Abbott*, the Court recognizes that P & G fails to specifically identify who published several of the statements, but either presumes that the speaker was an "Amway distributor" or alleges that the publisher was "Amway Corp." The Court finds that the identification of an Amway representative or agent as the publisher is sufficient for those statements in which P & G also indicates to whom the statement was published. *See Abbott*, 946 S.W.2d at 519–20. However, for those statements in which the publisher is identified as Amway or an Amway representative, agent, or dis-

tributor, but the recipient of the publication is "unknown," the Court concludes that Amway has proven the absence of publication to a third party. *See Abbott*, 946 S.W.2d at 520. Essentially, P & G does not know to whom these statements were published or whether they were actually heard by or published to a third party. P & G's vague assertions of possible but unknown instances of publication are insufficient to avoid summary judgment. *Henderson*, 933 F.Supp. at 1332. Therefore, Statements 131 and 138–148 are not actionable and P & G's defamation claims based on Statements 131 and 138–148 are DISMISSED.[3]

■■■ Next, Amway argues that Statement 133 is not actionable because there is no genuine issue of material fact concerning the essential element of publication. P & G claimed that Eugenio Villanueva ("Villanueva"), purportedly an Amway distributor, forwarded the Satanism rumor to Ray VanDerVelde ("VanDerVelde") at Amway via the Internet and to unknown persons. First of all, VanDerVelde is not a third party, but rather an employee of Amway. VanDerVelde serves as Amway's Supervisor for Affiliate Telecommunications Support. (Amway's Brief, Instrument No. 269, Exh. 8, ¶ 2). Second, VanDerVelde admitted that he received an e-mail from Villanueva containing the Satanism rumor, but stated that Villanueva is a vendor of telecommunications equipment employed by Cableworks of the Philippines, not by Amway. (*Id.* ¶ 3). According to VanDerVelde, Villanueva "was not an Amway distributor and [was] not connected to Amway in any way." (*Id.*). Amway's legal department instructed VanDerVelde to send Villanueva a response indicating that the rumor was false and that Amway does not condone the spreading of this rumor. P & G did not respond

**3.** Under federal law, defamation allegations must afford the defendant sufficient notice of the communications complained of to enable him to defend himself. *Liguori v. Alexander*, 495 F.Supp. 641, 647 (S.D.N.Y.1980).

Upon consideration, and even in the light most favorable to P & G, the Court finds that Statements do not provide sufficient notice to allow Amway and the other defendants to defend themselves.

to Amway's evidence concerning Statement 133.

So, essentially, there is no evidence that Statement 133 was published by an Amway representative, agent, or distributor. Furthermore, there is no evidence of any damage to P & G's reputation based on VanDerVelde's receipt of the e-mail. In fact, VanDerVelde responded to Villanueva by stating that the rumor was false. The remaining recipients of the e-mail are "unknown" to P & G. (Amway's Brief, Instrument No. 267, Exh. 1, at 35). As determined above, such a statement in which the recipient of the publication is "unknown," indicates that P & G does not know to whom these statements were published or whether they were actually heard by or published to a third party. Thus, the Court concludes that Amway has proven the absence of publication to a third party with respect to Statement 133. *See Abbott*, 946 S.W.2d at 520. P & G's vague assertions of possible but unknown instances of publication are insufficient to avoid summary judgment. *Henderson*, 933 F.Supp. at 1332. Therefore, Statements 133 is not actionable and P & G's defamation claim based on Statement 133 is DISMISSED.

In addition, Amway argues that Statement 129 is not actionable because there is no genuine issue of material fact as to whether the statement is defamatory, of and concerning P & G, and false. P & G states that Statement 129 is an "[u]nfair product comparison that suggests that Ultra Tide detergent goes down the drain as sludge[.]" (Amway's Brief, Instrument No. 267, Exh. 1, at 34). According to P & G, Statement 129 is contained in the December 1996 issue of the Amagram—documents T010213, 010236, and 010260. However, in the exhibits filed by P & G, the December 1996 edition of the Amagram is marked as AMT004249. (P & G's Opposition, Instrument No. 279, Exh. 43). Amway discusses this particular copy of the Amagram in its brief. Given the apparent confusion in the document reference number and the parties' failure to present all of the relevant documents to the 148 statements in a concise and organized fashion, the Court is unable to discern which document(s) reflects Statement 129. Therefore, Amway fails to meet its burden of proof with respect to Statement 129.

Lastly, Amway claims that Statement 132 is not actionable because the record shows that there is no genuine issue of material fact concerning the essential element of damages. Damage to reputation is the essence of defamation. *Finklea*, 742 S.W.2d at 516 ("[D]efamation claims must be predicated upon injury to reputation[.]"). Therefore, the challenged words or statements "must cause injury or harm to be defamatory[.]" *Abbott*, 946 S.W.2d at 519.

P & G indicated that Leroy Schloemer ("Schloemer"), an Amway distributor, published Statement 132 to Charles Wenker ("Wenker"). Schloemer allegedly told Wenker that "Tide Ultra 2 powder was 60% clay filler." (Amway's Brief, Instrument No. 267, Exh. 1, at 35). In his deposition, Wenker testified that Schloemer stated that "Tide contained a high percentage of clay filler[,]" (Amway's Brief, Instrument No. 267, Exh. 7, ¶ 3), but Wenker maintained that Schloemer never said anything to him that caused him to change his buying habits with respect to P & G's products or any other products, (*Id.* ¶ 4). Wenker also insisted that Schloemer's remarks never caused him to change his buying habits with respect to Tide laundry detergent or any other P & G product. (*Id.*). In fact, Wenker testified that, after his conversations with Schloemer, he began to purchase more Tide than he had been purchasing in the past. (*Id.*). P & G did not address Statement 132 in its brief.

Clearly, there is no genuine issue of material fact with respect to the element of damage for P & G's defamation claim based on Statement 132. There is no evidence that Schloemer's remark to Wenker concerning the composition of Tide damaged or injured P & G's reputation in any way. Wenker stated that nothing

Schloemer had ever said to him changed his perception or opinion about P & G. (Amway's Brief, instrument No. 269, Exh. 7, ¶ 4). Therefore, as for Statement 132, the Court finds that Amway has established the absence of the required element of harm. P & G's defamation claim based on Statement 132 is DISMISSED.

### B. Business Disparagement

The Court will now examine the merits of P & G's business disparagement claim. Having already determined that the two year statute of limitations for business disparagement bars Statements 1–111, the Court will only consider Statements 112–148.

First of all, under Texas law, "[n]on-defamatory statements will not support a claim for business disparagement." *Norris,* 949 S.W.2d at 427 (citing *Hurlbut,* 749 S.W.2d at 766 (noting that both defamation and business disparagement involve the imposition of liability for injury sustained through publications to third parties of a false statement affecting the plaintiff; the former protects the personal reputation of the plaintiff, the latter protects economic interests)). Therefore, those non-defamatory statements which are not actionable under P & G's defamation claim—Statements 131, 132, 133, and 138–148—are not actionable under P & G's business disparagement claim. P & G's business disparagement claims based on Statements 131, 132, 133, and 138–148 are **DISMISSED.**

The elements of a claim for business disparagement are: (1) publication of disparaging words by the defendant; (2) falsity; (3) malice; (4) lack of privilege (on the part of the defendant); and (5) special damages. *FDIC v. Perry Brothers, Inc.,* 854 F.Supp. 1248, 1274 (E.D.Tex.1994); *Dickson,* 960 S.W.2d at 850; *Granada Biosciences, Inc. v. Barrett,* 958 S.W.2d 215, (Tex.App.—Amarillo 1997, rev. denied); *Hurlbut,* 749 S.W.2d at 766.

Amway maintains that all of the remaining statements are not actionable because P & G cannot establish that the statements were published with "malice". "The malice element of this cause of action can be found if the actor is reasonably deemed to have acted unlawfully, intentionally and knowingly to disparage another without just cause or excuse." *Perry Brothers, Inc.,* 854 F.Supp. at 1275. In support of its contention, Amway submits the following testimony of an Amway employee:

> Amway has never communicated or published a false statement of fact concerning ... [P & G or P & G's] business or products with knowledge that the statement was false, nor did Amway have or entertain any doubts, serious or otherwise, about the truth of any statement of fact communicated or published by Amway concerning ... [P & G or P & G's] business or products. Furthermore, Amway has never communicated or published a false statement of fact about ... [P & G or P & G's] business or products with ill will, spite, or evil motive, or with the intent to interfere with the economic interest of ... [P & G] in an improper or unprivileged manner.

(Amway's Brief, Instrument No. 267, Exh. 5, ¶ 5). Other than this conclusory assertion by an Amway employee, Amway does not present any other evidence proving the lack of malice.

In response, P & G emphasizes its contention that the Satanism rumor has been repeatedly published over a span of twenty (20) years by Amway and its distributors. "The repetition and republication of [disparaging material] may establish malice." *Canales v. Salinas,* 288 S.W.2d 207, 211 (Tex.Civ.App.—San Antonio 1956, writ dism'd) (holding that statements by the defendant and fact that he caused defamatory charges, originally published in a newspaper, to be republished in book form were sufficient to establish malice). Consequently, the Court determines that a fact issues exists as to whether the disparaging statements were published with malice.

Additionally, Amway argues that the remaining statements are not actionable be-

cause P & G fails to prove that the company incurred special damages. Amway does not address each of the remaining statements individually. "Proof of special damages is an essential part of the plaintiff['s] cause of action for business disparagement." *Hurlbut*, 749 S.W.2d at 767. It "requires that [the] plaintiff 'establish pecuniary loss that has been realized or liquidated as in the case of lost specific sales.'" *Id.* (quoting W. KEETON, PROSSER AND KEETON ON THE LAW OF TORTS, § 128 at 971 (5th ed.1984)); *Johnson v. Hospital Corp. of Am.*, 95 F.3d 383, 391 (5th Cir.1996) ("to prove special damages, a plaintiff must provide evidence of direct, pecuniary loss attributable to the false communications of the defendants."). Moreover, "the communication must play a substantial part in inducing others not to deal with the plaintiff with the result that special damage, in the form of the loss trade or other dealings, is established." *Hurlbut*, 749 S.W.2d at 767.

According to Amway, P & G has no proof of special damages because the company has not identified any loss of business expected from any particular customer or prospective customer that heard or received one of the disparaging statements. In response, P & G maintains that the company has suffered a significant loss in sales because of the disparaging statements. Dr. Harvey S. Rosen, P & G's expert economist, reported that, from July 1994 to August 1997, the Satanism rumor has resulted in lost sales in the amount of $49.5 million. P & G also presents examples of consumer boycott statements or actions that resulted from the Satanism Rumor. P & G further asserts that a number of consumers called or wrote to P & G indicating that they would no longer purchase P & G products because of the Satanism Rumor. Thus, in the light most favorable to P & G, the Court concludes that a fact issue exists as to whether P & G suffered special damages as a result of each of the remaining disparaging statements.

Furthermore, Amway insists that P & G's business disparagement claim must fail because there is no evidence that the statements were the sole cause of any damage to P & G's business. In *Johnson v. Hospital Corp. of Am.*, 95 F.3d 383, 391 (5th Cir.1996), the Fifth Circuit rejected the plaintiffs' contention that "the actual disparagement need not be the sole, exclusive factor causing the plaintiffs' damages[,][but] ... need only be 'a substantial factor in bringing about the loss.'" According to Amway, in several depositions of P & G employees, P & G "admit[s] that there were many factors affecting the profitability of their products." (Amway's Brief, Instrument No. 267, at 23). Conversely, P & G maintains that the company "has suffered severe economic and pecuniary losses as a result of the [S]atanism [r]umor[,]" including a loss in sales. (P & G's Opposition, Instrument No. 279, at 10). As a result, Amway fails to establish the absence of a genuine issue of material fact as to whether P & G suffered direct, pecuniary loss attributable to the remaining allegedly false and disparaging statements of Amway and its distributors.

Moreover, Amway maintains that the statements concerning the Satanism rumor are not actionable as product disparagement. First of all, P & G asserts a business disparagement claim not a product disparagement claim. Second, although Amway articulates a legal standard, it fails to provide any explanation as to how the Satanism rumor does not constitute business disparagement as a matter of law. (Amway's Brief, instrument No. 267, at 18–19). "[I]f the main complaint is a false statement directly injurious to a business or property interest, and the damages alleged and proved are limited to business or property losses established with the specificity required for these sorts of damages, then the claim may properly be considered as one for business or property disparagement[.]" *Hurlbut*, 696 S.W.2d at 98. P & G asserts that the Satanism rumor disparages both P & G

itself and P & G's products. (P & G's Opposition, Instrument No. 279, at 7). According to P & G, the rumor "lists 45 P & G products by name and urges the recipient of the rumor not to buy any of those products. The message of the rumor is a request that the reader or listener stop buying P & G products because of the false association of the products with Satan[.]" (*Id.*). Thus, Amway fails to show that the Satanism rumor is not actionable under P & G's business disparagement claim as a matter of law.

Next, Amway contends that Statements 112–118 and 121–125 are not actionable because the record shows that there is no genuine issue of material fact that Amway or an Amway distributor was the publisher of the statements. In addition, Amway asserts that Statements 120 and 124 are not actionable because P & G merely identified the publisher as an "[u]nknown Amway distributor." Furthermore, Amway argues that Statements 112–118, 121, 122 and 125 are not actionable because P & G cannot prove that the statements were published to an identified person. The Court has already determined that the identification of an Amway representative, agent, or distributor as the publisher is sufficient for those statements in which P & G also indicates to whom the statement was published. *See Abbott,* 946 S.W.2d at 519–20. However, for those statements in which the publisher is identified as Amway or an Amway representative, agent, or distributor, but the recipient of the publication is "unknown," the Court finds that Amway has proven the absence of publication to a third party. *See Abbott,* 946 S.W.2d at 520. In these cases, there is no evidence that P & G knows to whom these statements were published or whether they were actually heard by or published to a third party. P & G's vague assertions of possible but unknown instances of publication are insufficient to avoid summary judgment. *Henderson,* 933 F.Supp. at 1332. Therefore, Statements 112–117, 121, 122, and 125 are not actionable and P & G's business disparagement claims based on these statements are DISMISSED.

With respect to Statement 119, Amway states that P & G cannot show that the statement was disparaging, "of and concerning" P & G or its products, published with malice, or the sole cause of any resulting damage to P & G. P & G stated that Statement 119, contained in documents S008056 and S008102, was an "[u]nfair product comparison re: Crystal Bright[.]" (Amway's Brief, Instrument No. 1, at 32). First of all, Amway does not explain how this statement does not concern P & G and fails to include document S008056. Second, the Court has already determined that a fact issue exists as to whether the remaining statements, including Statement 119, were published with malice and whether the statements caused direct, pecuniary loss to P & G's business.

As for Statement 119's disparaging effect, Amway argues that the product comparison test was accurate and truthful. Christopher A. Jacques, Amway's Senior Manager of Product and Technology Assessments, testified that the test "was based on performance testing of Crystal Bright compared to other automatic dishwashing products on the market. The dishwashing Advertisement [wa]s accurate and truthful." (Amway's Brief, Instrument No. 269, Exh. 6, ¶ 10). However, whether the comparison was unfair and disparaging or truthful and accurate is not clear from the record. Since Amway does not provide all of the documents relating to Statement 119, the Court declines to accept Jacques conclusory assertion that the statement was truthful as a matter of law.

Again, Amway argues that Statement 129 is not actionable because P & G cannot prove the essential elements of business disparagement with respect to this statement. As mentioned, it is not clear which document contains Statement 129. Statement 129 purportedly concerns the December 1996 issue of the Amagram; however, that issue references a different Bates number. Since the Court is unable to ascertain which document undoubtedly

contains Statement 129, the Court cannot address Amway's argument.

### C. Section 16.29 of the Texas Business & Commerce Code

■■■ First, Amway contends that Section 16.29 of the Texas Business & Commerce Code does not apply to the allegations made by P & G. Since the Court already concluded that the two year statute of limitations bars Statements 1–111, the Court will only consider Statements 112–148.

Section 16.29 provides that:

[a] person may bring an action to enjoin an act likely to injure a business reputation or to dilute the distinctive quality of a mark registered under ... Title 15, U.S.C.... regardless of whether there is competition between the parties or confusion as to the source of goods or services.

TEX. BUS. & COM. CODE § 16.29 (West 1998); *Exxon Corp. v. Oxxford Clothes, Inc.*, 109 F.3d 1070, 1083 (5th Cir.1997). In this case, Amway complains that P & G does not allege that the defendants "used any trademark, trade name or trade dress of ... [P & G] in such a fashion as to link such trademarks, trade names or trade dress to products of shoddy quality or portray in an unwholesome or unsavory context such that the public will associate the lack of quality or lack of prestige" with P & G's goods. (Amway's Brief, Instrument No. 269, at 27). Amway insists that such allegations are required to maintain an action under Section 16.29. In response, P & G claims that "Amway's argument ... reads an entire clause out of" Section 16.29. (P & G's Opposition, Instrument No. 279, at 47).

"The Texas statute ... states that in addition to enjoining trademark dilution a plaintiff may enjoin acts likely to injure business reputation." *Exxon Corp.*, 109 F.3d at 1083 n. 20. In *Exxon Corp. v. Oxxford Clothes, Inc.*, 109 F.3d 1070, 1083 n. 20 (5th Cir.1997), the Fifth Circuit stated that "[i]t [wa]s unclear whether this language create[d] a separate cause of action or merely expresse[d] the 'tarnishment' prong of the dilution cause of action." Although the Fifth Circuit recognized cases in other jurisdictions with similar statutes where the first harm, injury to the plaintiff's business reputation, had been subsumed into the second harm, dilution of a mark's distinctive quality, the Court did not expressly adopt this holding. Rather, the plain language of the statute indicates that a plaintiff may show either: (1) an act likely to injure its business; or (2) an act likely to dilute the distinctive quality of a registered trademark or a mark or trade name valid at common law. *See* TEX. BUS. & COM. CODE § 16.29 (West 1998). In the absence of any contrary authority from this jurisdiction, the Court declines to hold that a claim under Section 16.29 must be limited to the dilution of a mark's distinctive quality.

Lastly, Amway argues that Statements 111–147 are not actionable under P & G's Section 16.29 claim for the same reasons that they are not actionable under P & G's defamation and business disparagement claims. Amway, however, does not provide the Court with any authority suggesting that statements that fail to satisfy the specific elements of a defamation or business disparagement claim cannot form the basis of a Section 16.29 cause of action.

### D. Tortious Interference With Prospective Business Relations

Next, the Court will examine the merits of P & G claim for tortious interference with business relations. Having already determined that the one-year limitation period for defamation bars Statements 1–126, the Court will only consider Statements 127–148.

■■■ To prove a prima facie case of tortious interference with business relations, a plaintiff must prove that: (1) there was a reasonable probability that the plaintiff would have entered into a contractual relationship; (2) the defendant acted maliciously by intentionally preventing the

relationship from occurring with the purpose of harming the plaintiff; (3) the defendant was not privileged or justified; and (4) actual harm or damage occurred as a result. *Barker v. Brown*, 772 S.W.2d 507, 511 (Tex.App.—Beaumont 1989, no writ). "An action for interference with business relations has as its basis a person's right to be free from malicious interference while conducting negotiations which have a reasonable probability of resulting in a contract." *Id.* However, the plaintiff need not show actual malice, but must establish that the defendant "acted unlawfully, intentionally and knowingly, without just cause or excuse." *Id.*

First, Amway contends that P & G's tortious interference claim must fail because there is no evidence of any specific prospective relationships that failed to materialize. Under Texas law, "[i]t need not be absolutely certain that the prospective contract would have been made were it not for such interference. A reasonable assurance thereof in view of all the circumstances, is generally sufficient." *Leonard Duckworth, Inc. v. Michael L. Field & Co.*, 516 F.2d 952, 956 (5th Cir.1975). "[W]here there is no contract, . . . a party does not have a right to be free from competition, but instead merely has the right to be free from malicious interference with the right to conduct negotiations that have a reasonable probability of resulting in a contract." *Id.* The defendant only needs to "know that some party or parties had a prospective contractual relationship" with P & G. *Verkin v. Melroy*, 699 F.2d 729, 733 (5th Cir.1983).

Here, P & G emphasizes that the company received several "letters from customers who stated [that] they did not buy P & G's products because of the Satanism [r]umor and other disparaging statements for which Amway is responsible." (P & G's Opposition, Instrument No. 279, at 48). P & G also submits evidence of individual lost sales. Although it is not clear whether the letters or lost sales are from one of the recipients of the remaining statements, the Court finds that a genuine

issue of material fact remains as to whether P & G had a reasonable probability of entering into a business relationship with these individuals had the defendants not published the allegedly false and defamatory statements.

Additionally, Amway maintains that P & G's tortious interference claim must fail because there is no evidence of causation. Under Texas law, "[i]t must reasonably appear . . ., in view of all the circumstances" that "the prospective contract would have been made but for the interference[.]" *Exxon Corp. v. Allsup*, 808 S.W.2d 648, 659 (Tex.App.—Corpus Christi 1991, writ denied). The Court finds that given the letters from customers who stated that they did not buy P & G's products because of the rumor and the evidence of individual lost sales, there is a genuine issue of material fact as to whether P & G would have entered into prospective contracts but for the defendants' alleged interference.

Next, Amway argues that Statements 127, 128, 130, 131, 133, and 134–147 are not actionable because P & G either did not specifically identify the Amway distributor, wrongfully identified the individual as an Amway agent, or failed to identify who received the statement. "Some of the grounds that bar . . . [P & G's] recovery for . . . [defamation and business disparagement] also apply to their claim for tortious interference with contract rights because both claims are based on the same allegedly false and disparaging statements." *Hurlbut*, 696 S.W.2d at 100. The Court has already determined that the identification of an Amway representative, agent, or distributor as the publisher is sufficient for those statements in which P & G also indicates to whom the statement was published. *See Abbott*, 946 S.W.2d at 519–20 (involving a defamation claim). Such identification of the publisher also serves to identify Amway or its distributor as the entity or individual that committed the intentional and malicious act of interference.

■ However, for those statements in which the publisher is identified as Amway or an Amway representative, agent, or distributor, but the recipient of the publication is "unknown," the Court finds that P & G cannot establish that the defendants actually published the statement or material to anyone. Without such evidence, P & G cannot show that the defendants committed an intentional and malicious act that prevented any relationship from occurring. Therefore, as under P & G's defamation and business disparagement claims, Statements 131 and 138–148 are not actionable under P & G's business disparagement claim. Furthermore, since it is undisputed that Villanueva is not an Amway employee, Statement 133 is not actionable under P & G's tortious interference claim.

■ Furthermore, Amway contends that Statement 132 is not actionable because there is no evidence of any resulting damage to P & G because of this statement. In order to succeed on a claim for tortious interference with prospective business relations, P & G must show that "actual harm or damage resulted from the defendant[s'] interference." *Exxon Corp.*, 808 S.W.2d at 659. As mentioned, Wenker insisted that Schloemer's remarks never caused him to change his buying habits with respect to Tide laundry detergent or any other P & G product. (Amway's Brief, Instrument No. 269, Exh. 7, ¶ 4). In fact, Wenker testified that, after his conversations with Schloemer, he began to purchase more Tide than he had been purchasing in the past. (*Id.*). P & G does not submit any evidence that, by publishing Statement 132, Amway or its distributor, Schloemer, intentionally and malicious committed an act that prevented a business relationship from occurring. Consequently, Statement 132 is not actionable under P & G's claim for tortious interference with prospective business relations.

Lastly, Amway argues that Statement 129 is not actionable because P & G cannot prove interference or an intentional and malicious act by the defendants. As mentioned, it is not clear which document contains Statement 129. Statement 129 purportedly concerns the December 1996 issue of the Amagram; however, that issue references a different Bates number. Since the Court is unable to ascertain which document undoubtedly contains Statement 129, the Court cannot address Amway's argument.

### E. Section 43(a) of the Lanham Act

P & G claims that the defendants, including Amway, have made misleading and deceptive statements "concerning their commercial activities and their own products which are sold in interstate commerce" and "concerning ... [P & G] and its products, which are sold in interstate commerce[.]" (Complaint, Instrument No. 86, ¶¶ 126 and 127). According to P & G,

the false, misleading and deceptive statements include, but are not limited to the following:

(a) Advertising, publishing disseminating, and communicating false and misleading statements and unfounded misrepresentations about the business, goodwill, and reputation of ... [P & G], including false statements that ... [P & G] and/or their corporate president and involved in or connected with Satanism, the devil, or other undesirable or negative associations.

(b) Advertising, publishing, and communicating false and misleading statements and unfounded misrepresentations about ... [P & G's] products, including lies that ... [P & G's] products contain sludge, harmful abrasives, harmful ingredients, adulterants, and/or fillers, are harmful to consumers, clothing, appliances, and homes, and that ... [P & G's] products are less effective, more expensive, and/or inferior to Amway's competing products.

(c) Advertising, implying, and communicating false and misleading misrepresentations about the economic benefits of using Amway's products and the eco-

nomic detriments of using ... [P & G's] products.

(*Id.* at ¶ 128). These allegedly misleading and deceptive statements may be categorized as follows: (a) statements perpetuating the Satanism rumor; (b) product specific statements; and (c) statements contributing to Amway's pyramid scheme.

P & G also alleges that the defendants wrongfully

> operate, control, participate in and benefit from false and misleading statements made to potential and actual Amway distributors whereby the Amway organization obtains investments and product purchases from new recruits, promises recruits that they will become wealthy if they stop purchasing ... [P & G] products and instead purchase Amway products, and emphasizes the recruitment of new distributors rather than the sale of product at retail.

(*Id.* at ¶ 129). P & G maintains that the publication of these false and deceptive statements and representations and the other acts and conduct of the defendants constitute a violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a). (*Id.* at ¶ 133).

■■■ "The Lanham Act was enacted 'to protect persons engaged in ... commerce against unfair competition.'" *Seven–Up Co. v. Coca–Cola Co.*, 86 F.3d 1379, 1382 (5th Cir.1996) (quoting 15 U.S.C. § 1127). Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), provides, in relevant part, that:

> [a]ny person who, on or in connection with any goods or services, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which ... in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1)(B). "This section provides protection against a 'myriad of deceptive commercial practices,' including false advertising or promotion." *Seven–Up Co.*, 86 F.3d at 1383 (quoting *Resource Developers v. Statue of Liberty—Ellis Island Found.*, 926 F.2d 134, 139 (2d Cir. 1991)). "Section 43(a) of the Lanham Act has been characterized as a remedial statute that should be broadly construed." *Id.* "Representations are not shielded from condemnation under [S]ection 43(a) simply because they are literally true. The Act's proscriptions against false representation reaches 'innuendo, indirect intimations, and ambiguous suggestions evidenced by the consuming public's misapprehension of the hard facts underlying an advertisement,' *Vidal Sassoon, Inc. v. Bristol–Myers Co.*, 661 F.2d 272, 277 (2d Cir.1981), as well as 'blatant falsehoods,' *Id.*" *Better Business Bureau of Metropolitan Houston, Inc. v. Medical Directors, Inc.*, 681 F.2d 397, 400 (5th Cir.1982).

■■■ Thus, the basic elements a plaintiff must allege in an action under Section 43(a) of the Lanham Act are the following:

> (1) that the defendant has made false or misleading statements as to his own product or another's; (2) that there is actual deception or at least a tendency to deceive a substantial portion of the intended audience; (3) that the deception is material in that it is likely to influence purchasing decisions; (4) that the advertised goods traveled in interstate commerce; and (5) that there is likelihood of injury to the plaintiff in terms of declining sales, loss of goodwill, etc.

*Seven–Up Co.*, 86 F.3d at 1383 n. 3; *Pebble Beach Co. v. Tour 18 I, Ltd.*, 942 F.Supp. 1513, 1562 (S.D.Tex.1996), *aff'd as modified by*, 155 F.3d 526 (5th Cir.1998).

■■■ With respect to standing, [a] plaintiff bringing suit under ... [Section] 43(a) must "demonstrate a 'reasonable interest to be protected' against the advertiser's false or misleading claims, and a 'reasonable basis' for

believing that this interest is likely to be damages by the false or misleading advertising. The 'reasonable basis' prong embodies a requirement that the plaintiff show both likely injury and a causal nexus to the false advertising." *PDK Labs, Inc. v. Friedlander*, 103 F.3d 1105, 1111 (2d Cir.1997) (quoting *Ortho Pharmaceutical Corp. v. Cosprophar, Inc.*, 32 F.3d 690, 694 (2d Cir.1994) (internal citations omitted)). In *Berni v. International Gourmet Restaurants of Am., Inc.*, 838 F.2d 642, 648 (2d Cir.1988), the Second Circuit indicated that, "at a minimum, standing to bring a[S]ection 43(a) claim requires the potential for a commercial or competitive injury." A present or future commercial interest, and a direct pecuniary interest are " 'reasonable interests' that confer standing." *Friedlander*, 103 F.3d at 1111; *Berni*, 838 F.2d at 648.

Amway presents several arguments as to why P & G's claim under Section 43(a) of the Lanham Act must fail. In its brief, Amway addresses each of the three types of statements challenged by P & G individually. As mentioned, the three categories of statements are: (1) those concerning the Satanism rumor, (2) product-specific statements, and (3) those relating to Amway's alleged pyramid scheme. Since the Court has already determined that Statements 1–63 are barred by the four year statute of limitations, the Court will only review Statements 64–148.

### 1. Satanism Rumor

■ First, Amway suggests that the statements involving the Satanism rumor, Statements 66–110, are not actionable under Section 43(a) of the Lanham Act because they do not address the quality, ingredients, or performance of any product. In response, P & G argues that the statements perpetuating the Satanism rumor violate Section 43(a) because they "specifically refer[ ] to and malign[ ] more than 40 P & G products by name and call[ ] for a boycott of those products[,] ... [and therefore,] malign[ ] P & G's goods" and disparage P & G's "commercial activi-

ties." (P & G's Opposition, Instrument No. 279, at 28).

The Court does not agree that the statements concerning the Satanism rumor "misrepresents the nature, characteristics, qualities, or geographic origin" of P & G's goods or services. In *Tire Kingdom, Inc. v. Morgan Tire & Auto, Inc.*, 915 F.Supp. 360, 362 (S.D.Fla.1996), a tire retailer, Tire Kingdom, Inc. ("Tire Kingdom"), sued its competitor, Morgan Tire & Auto, Inc. ("Morgan Tire"), alleging that Morgan Tire's false advertising violated Section 43(a) of the Lanham Act. In particular, Tire Kingdom argued that Morgan Tire's "advertisements using the good, better, best format to display Economy, Don Olsen, and Dayton tire options violate[d] the Lanham Act." *Id.* at 365. In this advertisement,

> Morgan Tire displays three categories of low cost radial tires in a row. The first option is the Economy which sells for $8.99 with a 40,000 mile warranty, in the middle is the Don Olsen which sells for $13.99 with a 50,000 mile warranty, and finally the Dayton which sells for $18.99 with a 60,000 mile warranty.

*Id.* Both parties agreed that the Economy and the Don Olsen were, in fact, the same tire, but that they had different warranties. *Id.* Tire Kingdom maintained that this advertisement misled "consumers into believing that three different levels of tires exist, one low quality, one middle quality, and one high quality, when only two levels of quality exist" and thereby, violated Section 43(a). *Id.*

The court, however, decided that "the good, better, best advertisement d[id] not pertain to the nature, quality, characteristics, or geographic origin" of Morgan Tire's product. *Id.* at 366. "The advertisement d[id] not make any representations that the Economy and Don Olsen options include[d] different quality tires, one low and one middle range." *Id.* Rather, "[t]he different warranties offered for the Economy and the Don Olsen options account[ed] for the difference in price."

*Id.* "The challenged advertisement simply d[id] not distort, deceive, or mislead regarding the quality, nature, characteristics, or geographic origin of the advertised products." *Id.*

Furthermore, the court concluded that the advertisements representing that Morgan Tire was a multi-brand tire dealer were not actionable under the Lanham Act. *Id.* at 369. "In its advertisements, Morgan Tire represent[ed] that it s[old] Pirelli, Michelin, Goodyear, Firestone, Dayton, and Bridgestone tires." *Id.* Tire Kingdom maintained that "such representations were false and misleading because Morgan Tire primarily s[old] Bridgestone/Firestone products." *Id.* The court reasoned that "whether an entity promote[d] itself as a multi-brand dealer d[id] not misrepresent the quality, nature, characteristics, or geographic origin of its products." *Id.*

> Here, the Satanism rumor allegedly relates that the President of . . . [P & G] appeared on the Phil Donahue television program and stated that . . . [P & G] was associated with Satan. The Satanic Message typically states that . . . [P & G's] Moon and Stars trademark is a Satanic symbol which has appeared or will appear on . . . [P & G] product labels along with the numbers "666," said to be the mark of the devil. The Satanic Message typically urges that consumers boycott all . . . [P & G] products, including some 40 specifically identified . . . [P & G] products.

(Complaint, Instrument No. 86, ¶ 64). P & G asserts that the Satanism concerns the company's goods because "Amway has associated specific P & G products with Satan, the most vile, derogatory association possible." (P & G's Opposition, Instrument No. 279, at 29). According to P & G, "the taint on a product by stating it is associated with the devil is obvious." (*Id.*). P & G then emphasizes that consumers have "written to P & G [stating] that they are nauseated and disgusted and will not continue to purchase P & G products because of the strong association of those products with evil[.]" (*Id.*).

Although the statement or message containing the Satanism rumor identifies approximately 40 of P & G's products, the statement does not misrepresent the quality, nature, characteristics, or geographic origin of P & G's goods or products. Rather, it associates P & G, the company, with Satan. A company's status "does not misrepresent the quality, nature, characteristics, or geographic origin of its products." *Tire Kingdom*, 915 F.Supp. at 369.[4] Therefore, the Court finds that the statements concerning the Satanism rumor are not actionable as misrepresentations about the nature, characteristics, qualities, or geographic origin of P & G's products.

However, the Court does find that the statements perpetuating the Satanism rumor misrepresents P & G's "commercial activities." In *Fuente Cigar, Ltd. v. Opus One*, 985 F.Supp. 1448, 1449-50 (M.D.Fla. 1997), a case cited by P & G, a competitor, Opus One, brought a trademark infringement action against Fuente Cigar Ltd. ("Fuente Cigar"), a cigar manufacturer, alleging that Fuente Cigar infringed its "Opus One" mark. Thereafter, a representative of Opus One was interviewed for an article in Cigar Insider, a trade publication for the cigar industry. *Id.* In the article, the representative stated that Fuente Cigar was using the term "Opus" to trade on the company's reputation and that Fuente Cigar had effectively appropriated Opus One's mark. *Id.*

Fuente Cigar then sought to amend its complaint to add a counter-claim under

---

4. The Utah Court also concluded that P & G's Lanham Act claim based on the Satanism rumor failed because the "misrepresentation . . . d[id] not relate to a product within the meaning of the Lanham Act." *The Procter & Gamble Company, et. al v. Haugen, et. al,* Case No. 1:95CV0094K, at 3 (D.Utah Sept. 4,

1998); (Amway's Brief, Instrument No. 267, Exh. 4B, at 3). The court stated that "[a]lthough the Amvox message identifie[d] 45 Proctor & Gamble products, it d[id] not contain false representations about the qualities or characteristics of those products." *Id.*

Section 43(a) of the Lanham act based on the defamatory statements made by Opus One's representative. *Id.* at 1453. In response, Opus One argued that Fuente Cigar could not make a Section 43(a) claim because the comments made by its representative did not reach Fuente Cigar's "goods or services." *Id.* at 1454. The court disagreed, noting that the "plain language of the statute . . . makes actionable statements pertaining not only to goods and services, but also to 'commercial activities.'" *Id.* According to the court, "[i]n stating that Fuente [Cigar] was trying 'to trade on [Opus One's] reputation,' and that Fuente [Cigar] had 'effectively appropriated' Opus One's mark, Opus One was plainly making statements about Fuente [Cigar's] commercial activities." *Id.*

▮ In this case, P & G asserts that the Satanism rumor is a "misrepresentation about P & G's commercial activities." (P & G's Opposition, Instrument No. 279, at 30). P & G claims that the rumor also stated that "a large portion of the profits from . . . [P & G] products go to support a satanic church." (*Id.*). According to P & G, "a statement about the matter in which P & G allocates and distributes its profits is clearly concerned with P & G's 'commercial activities.'" (*Id.*). The Court agrees. As the court noted in *Fuente Cigar*, the plain language of the statute makes statements pertaining to a company's commercial activities actionable under the Lanham Act. Therefore, the Court concludes that those statements involving the Satanism rumor are actionable under Section 43(a) of the Lanham Act as alleged misrepresentations pertaining to P & G's commercial activities.

▮ Next, Amway contends that the Satanism statements are not actionable because they do not constitute "commercial speech," and in turn, are not "commercial advertising or promotion." In *Seven–Up Co. v. Coca–Cola Co.*, the Fifth Circuit adopted the following requirements for establishing "commercial advertising or promotion" under Section 43(a):

[the] representations . . . must be[ ] (1) commercial speech; (2) by a defendant who is in commercial competition with plaintiff; (3) for the purpose of influencing consumers to buy defendant's goods or services. While the representations need not be made in a "classical advertising campaign," but may consist instead of more informal types of "promotion," the representations (4) must be disseminated sufficiently to the relevant purchasing public to constitute "advertising" or "promotion" within that industry.

86 F.3d 1379, 1384 (5th Cir.1996) (quoting *Gordon & Breach Science Publishers v. American Inst. of Physics*, 859 F.Supp. 1521, 1535–36 (S.D.N.Y.1994)). The United States Supreme Court has defined "commercial speech" as "speech which does 'no more than propose a commercial transaction.'" *Bolger v. Youngs Drug Products Corp.*, 463 U.S. 60, 103 S.Ct. 2875, 2880, 77 L.Ed.2d 469 (1983) (quoting *Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 96 S.Ct. 1817, 1825, 48 L.Ed.2d 346 (1976)). However, "[t]he mere fact that . . . [the documents] are conceded to be advertisements clearly does not compel the conclusion that they are commercial speech. Similarly, the reference to a specific product does not by itself render the . . . [documents] commercial speech." *Id.* Furthermore, the fact that the defendants have "an economic motivation for mailing the . . . [documents] would clearly be insufficient by itself to turn the materials into commercial speech." *Id.*

▮ According to Amway, "the content of the message, not the status of the sender, determines whether it is commercial speech." (Amway's Brief, Instrument No. 267, at 36–37). Amway, however, does not provide any additional explanation as to why the content of the Satanism rumor does not constitute commercial speech. On the other hand, P & G presents several acknowledgments by Amway and its distributors that they have consistently used

the Satanism rumor to achieve a commercial gain over the sale of P & G's products. (P & G's Opposition, Instrument No. 279, at 31). For example, Ms. Charbonnean testified that she, as an Amway distributor, used the Satanism rumor as a tool to recruit other Amway distributors and to sell Amway products. (P & G's Opposition, Instrument No. 279, Exh. A–4, at 34). Thus, in the light most favorable to P & G, the Court finds that Amway fail to meet its burden or proving that the Satanism statements do not constitute "commercial advertising or promotion."

■ Lastly, Amway maintains that those statement for which P & G indicated that the publisher or the recipient of the statement is "unknown" are not actionable under Section 43(a) of the Lanham Act. In response, P & G correctly states that "Amway has cited no authority for imposing such identification requirements under the Lanham Act." (P & G's Opposition, Instrument No. 279, at 28 n. 19). Unlike P & G's other claims, a claim under the Lanham Act only requires that the plaintiff allege that the defendant made a false or misleading statement such that there is a *likelihood* of injury to the plaintiff. *Seven–Up Co.*, 86 F.3d at 1383. There is no requirement that P & G show that consumers were actually deceived or that P & G actually sustained any injury. *Seven–Up Co.*, 86 F.3d at 1383 n. 3. Thus, Amway has not presented any authority suggesting that the plaintiff must prove that the false or misleading statement was heard or received by a third party. The plaintiff must simply indicate that the representation had been " 'disseminated sufficiently to the relevant purchasing public[.]' " *Id.* (quoting *Gordon and Breach*, 859 F.Supp. at 1536). Therefore, in the light most favorable to P & G, the Court finds that, for its Section 43(a) claim, P & G can rely on those statements in which P & G indicates that the speaker or recipient of the statement is "unknown" or "anonymous."

■ However, the Court concludes that Statements 68, 102, and 133 are not actionable under Section 43(a) because

there is no evidence that these false or misleading statements were made by Amway or one of its distributors. Statement 68 purportedly was spoken by Mrs. Champ. Doug DeVos ("DeVos"), Senior Vice President of Asia/Pacific Global Distributor Relations, testified that "there is no record of an Amway employee or distributor named Mrs. Champ from Boise, Idaho from 1993 until the present." (Amway's Brief, Instrument No. 267, Exh. 5, ¶ 3). Supposedly, Statement 102 was made by Mark Davis. Amway, however, emphasizes that Mark Davis, a talk show host, is not alleged by P & G to be an Amway distributor or employee. In addition, Villanueva allegedly published Statement 133. As mentioned, there is no evidence that Villanueva is a distributor of Amway or an Amway employee. P & G does not respond to Amway's argument and does not present any evidence suggesting that these individuals have any connection with Amway. Consequently, Statements 68, 102, and 133 are not actionable under P & G's Section 43(a) claim as misrepresentations by the defendants of the nature, characteristics, qualities, or geographic origin of P & G's goods or commercial activities.

## 2. Product-specific Statements

Again, Amway argues that P & G cannot base its Section 43(a) claim on several of the product-specific statements because P & G did not identify the speaker or recipient of those statement. The Court, however, has already concluded that Amway fails to prove that such statements are not actionable as a matter of law.

■ Amway then maintains that Statements 64, 65, 119, and 129 are not actionable because there is no evidence "that such statements [we]re false and misleading or that the relevant consuming public ha[d] been misled by any of these statements or comparisons." (Amway's Brief, Instrument No. 279, at 38). For example, with respect to Statement 65, Amway purportedly implied, in a product comparison

test, that Crest toothpaste would scratch the user's teeth. (Amway's Brief, Instrument No. 267, Exh. 1, at 20). Amway contends that the advertisement identified as Statement 65 was "accurate and truthful" and "based on the recommended use of levels of each of the identified Amway and non-Amway products depicted in the advertisement." (Amway's Brief, Instrument No. 267, at 38). For all of these statements, P & G asserts that each involves an unfair product comparison using a P & G product. According to P & G, the company has received phone calls from several people, inquiring whether the product comparisons were accurate. (P & G's Opposition, Instrument No. 279, at 32 n. 25). Therefore, the Court finds that a genuine issue of material fact exists as to whether Statements 64, 65, 119, and 129 were false or misleading and whether the statements actually deceived or had a tendency to deceive a substantial portion of the intended audience.

 In addition, Amway argues that Statement 132, which was purportedly published to Wenker, is not actionable since there is no evidence that the relevant consuming public, namely, Wenker, had been misled by the statement or that P & G was damaged by the statement, Amway's contention, however, misinterprets the relevant law. To state an action under Section 43(a), P & G must only allege that the statement actually deceived or had a tendency to deceive a substantial portion of the intended audience. *See Seven–Up Co.*, 86 F.3d at 1383 n. 3. Furthermore, P & G need only claim that there was a likelihood of injury to the company as a result of the statement. *See id.* Wenker's testimony that Statement 132 did not change his own buying habits does not prove that Statement 132 is not actionable as a matter of law. Consequently, P & G may rely on Statement 132 in asserting its Section 43(a) claim under the Lanham Act.

### 3. Pyramid Scheme

 First of all, Amway contends that P & G cannot base its Section 43(a) claim on those statements promoting Amway's alleged pyramid scheme because P & G lacks standing to challenge those statements. Amway emphasizes that P & G and Amway are not the only competitors in the household products market, that customers had products other than P & G and Amway goods that they may have chosen to purchase, and that intervening factors existed between the defendants' allegedly fraudulent conduct and P & G's losses. Amway also insists that P & G "cannot employ the Lanham Act as a surrogate for a private cause of action under the Federal Trade Commission Act." (Amway's Brief, Instrument No. 279, at 40). In response, P & G adamantly disagrees with Amway's arguments and cites *Conte Bros. Automotive, Inc. v. Quaker State–Slick 50, Inc.*, 165 F.3d 221 (3d Cir.1998), as authority for its contention that, as Amway's competitor, P & G has standing to sue under Section 43(a).

In *Conte Bros.*, the Third Circuit examined "whether retailers ha[d] standing to sue under [S]ection 43(a) of the Lanham Act ... to bring false advertising claims against manufacturers of products that compete[d] with those the retailers s[old]." 165 F.3d at 223. The appellants were "a putative nationwide class of retail sellers of motor oil and other engine lubricants that purportedly compete[d] with Slick 50, a Teflon-based engine lubricant" that was manufactured by the defendants. *Id.* at 223–24. In their complaint, the appellants asserted that the appellees had "falsely advertised that the addition of Slick 50 would reduce the friction of moving parts, decrease engine wear, and improve engine performance and efficiency." *Id.* at 224.

The Federal Trade Commission ("FTC") also brought an action against the appellees based on the same claimed benefit of Slick 50. *Id.* The parties settled and the appellees were enjoined from making false and unsubstantiated claims about Slick 50. *Id.* The appellees also agreed to provide "$10 million in discounts, cash rebates and free products to affected consumers." *Id.* The appellants' claim under Section 43(a)

of the Lanham Act against the appellees raised the same allegations as those asserted in the FTC suit. *Id.*

The appellees moved to dismiss the appellants' complaint for lack of standing. *Id.* The district court dismissed the complaint, holding that "retailers like [the][a]ppellants lacked standing under the Lanham Act to pursue false advertising claims against manufacturers of competing products." *Id.* On appeal, the Third Circuit agreed, stating that the retailers did "not satisfy the prudential standing requirements implicit in ... [Section] 43(a) of the Lanham Act." *Id.* at 223.

The Third Circuit noted that "[s]tanding [wa]s comprised of both constitutional and prudential components." *Id.* at 225. The constitutional component "requires a plaintiff to demonstrate that he or she suffered 'injury in fact,' that the injury is 'fairly traceable' to the actions of the defendant, and that the injury will likely be redressed by a favorable decision." *Id.* (quoting *Bennett v. Spear,* 520 U.S. 154, 117 S.Ct. 1154, 1161, 137 L.Ed.2d 281 (1997)). With respect to prudential standing,

> it is generally required (1) that a litigant "asserts his [or her] own legal interests rather than those of third parties," (2) that courts "refrain from adjudicating abstract questions of wide public significance which amount to generalized grievances," and (3) *that a litigant demonstrate that the asserted interests are arguably within the "zone of interest" intended to be protected by the statute ... on which the claim is based.*

*Id.* at 226 (emphasis added) (quoting *Wheeler v. Travelers Ins. Co.,* 22 F.3d 534, 538 (3d Cir.1994)).

Under third element, the "zone of interest" test, the Third Circuit recognized that the appropriate inquiry was whether Congress intended parties in the appellants' position to have standing to sue under Section 43(a). *Id.* In other words, "the 'dispositive question' of a party's prudential standing ... [was] 'whether the party ha[d] a *reasonable interest* to be protected against false advertising.'" *Id.* at 230

(quoting *Thorn v. Reliance Van Co.,* 736 F.2d 929, 933 (3d Cir.1984) (emphasis added)); *see Friedlander,* 103 F.3d at 1111. The Third Circuit then concluded that the "test for antitrust standing set forth by the Supreme Court in *Associated Gen. Contractors of California, Inc. v. California State Council of Carpenters* ... provide[d] an appropriate method for *adding content to ... [the] 'reasonable interest' test." Id.* at 232 (emphasis added). Under this test for standing, a court should consider the following factors:

> (1) The nature of the plaintiff's alleged injury: Is the injury "of a type that Congress sought to redress in providing a private remedy for violations of the ... [Lanham Act]?"
>
> (2) The directness or indirectness of the asserted injury.
>
> (3) The proximity or remoteness of the party to the alleged injurious conduct.
>
> (4) The speculativeness of the damages claim.
>
> (5) The risk of duplicative damages or complexity in apportioning damages.

*Id.* at 233 (internal citations omitted).

After applying each of these factors, the Third Circuit concluded that the appellants lacked standing to sue under Section 43(a) of the Lanham Act. *Id.* at 236. First, the Court recognized that the

> focus of the Lanham Act is on "commercial interests [that] have been harmed by a *competitor's* false advertising," *Granite State Ins. Co. v. Aamco Transmissions, Inc.,* 57 F.3d 316, 321 (3d Cir. 1995)[,] ... and in "secur[ing]" to the business community the advantages of reputation and good will by preventing their diversion from those who have created them to those who have not[,]" S.Rep. No. 1333, 79th Cong., 2d Sess. (1946), reprinted in 1946 U.S.C.C.A.N. 1274, 1275.

*Conte Bros.,* 165 F.3d at 234 (emphasis added). The appellants asserted that they suffered a loss of sales at the retail level because of the false advertising. *Id.* How-

ever, since the appellants did not allege a competitive harm and gave no indication that their good will or reputation had been harmed directly or indirectly, the Court determined that Congress did not intend to redress the harm alleged by the appellants in enacting the Lanham Act. *Id.*

Second, the Court determined that the appellants' "remoteness from the allegedly harmful conduct ... weigh[ed] against recognizing a right to sue on these facts." *Id.* at 234. Relying on the Supreme Court's rationale in *Associated Gen. Contractors,* the Third Circuit reasoned that "the 'existence of an identifiable class of persons'—*manufacturers* of competing products—'whose self-interest would normally motivate them to vindicate the public interest ... diminishe[d] the justification for allowing a more remote party ... to perform the office of a private attorney general.'" *Conte Bros.,* 165 F.3d at 234 (emphasis added).

Third, the Court found that "any damages suffered by [the] [a]ppellants were, if not speculative, then certainly avoidable." *Id.* at 235. According to the Court, "[i]f the retailers [had] responded to the artificially-increased popularity of Slick 50 that allegedly resulted from the false advertising campaign by stocking Slick 50, they would not have suffered any damages." *Id.* Lastly, the Court held that "recognizing the right of every potentially injured party in the distribution chain to bring a private damages action would subject defendant firms to multiple liability for the same conduct and would result in administratively complex damage proceedings." *Id.* The Court reasoned as follows:

> If every retailer had a cause of action for false advertising regardless of the amount in controversy, regardless of any impact on the retailer's ability to compete, regardless of any impact on the retailer's good will or reputation, and regardless of the remote nature of the injury suffered, the impact on the federal courts could be significant.... Such an action hardly seems befitting of a statute that was designed primarily to resurrect the federal tort of unfair competition after it was consigned to the post-*Erie* ashheap.
>
> *Id.*

As in *Conte Bros.,* this Court finds that P & G lacks standing to sue under Section 43(a) of the Lanham Act based on the statements promoting Amway's alleged pyramid scheme. In its complaint, P & G makes the following allegations:

> Defendants operate, control, participate in and benefit from false and misleading statements made to potential and actual Amway distributors where by the Amway organization obtains investments and product purchases from new recruits, promises recruits that they will become wealthy if they stop purchasing ... [P & G] products and instead purchase Amway products, and emphasizes the recruitment of new distributors rather than the sale of product at retail. As, a result the primary focus of the Amway organization is recruitment of new distributors, and selling to those distributors, rather than selling product at retail. Amway distributors derive substantially all of their Amway related income from recruiting new distributors and the sale of motivational and other recruitment tapes and materials, rather than from the sale of Amway products at retail to the consumers who are not participants in Amway. Defendants have used the false, misleading and deceptive statements ... in the advertising and/or promotion of their commercial activities. These false, misleading and deceptive statements include misrepresentations that Amway distributors and/or recruits will become wealthy by becoming a part of the Amway organization. The Amway Pyramid takes advantage of the vulnerabilities of Amway distributors and recruits by portraying in elaborate detail the enormous wealth they can purportedly acquire by becoming Amway distributors. Defendants refer to these false representations of fantastic wealth as "dreambuilding." These false, misleading and deceptive

statements are designed to recruit individuals into the Amway Pyramid and thereby and thereafter coerce them not to buy ... [P & G] products, all of which is done in order to maintain the Amway Pyramid and prevent its collapse.

. . . .

[P & G] has been injured as a direct and proximate result of Defendants' conduct. ... [P & G] has suffered a direct diversion of its sales from itself to Amway as well as injury to the goodwill and reputation that it and its products enjoy with the buying public.

(Complaint, Instrument No. 86, ¶¶ 129 and 132).

Although P & G asserts a competitive harm and argues that the company has suffered an injury to its goodwill and reputation and a direct diversion of its sales from itself to Amway, the Court finds that P & G's remoteness from the Amway's allegedly harmful conduct, the speculative nature of damages suffered by P & G, and the negative implications on judicial administration weigh heavily against judicial enforcement of this claim. Essentially, P & G claims that the company "is losing sales to a competitor that uses ... [fraudulent statements of potential wealth from the sale of Amway products] as a part of its marketing strategy." (P & G's Opposition, Instrument No. 279, at 40). However, "the existence of an identifiable class of persons"—namely, Amway distributors who have lost money—"whose self-interest would normally motivate them to vindicate the public interest ... diminishes the justification for allowing a more remote party such as ... [P & G] to perform the office of a private attorney general." *Associated Gen. Contractors*, 103 S.Ct. at 910–911.[5]

The retailer class in *Conte Bros.* involved more directly harmed plaintiffs than P & G in this case.

Furthermore, the damages suffered by P & G are too speculative. Even if the successfulness of Amway's organization required the participants to purchase Amway products, this does not mean that the participating distributors would have otherwise bought P & G products. It is undisputed that P & G and Amway are not the only competitors in the household products market. Moreover, recognizing the right of P & G to bring a private damages action under Section 43(a) based on the statements promoting Amway's alleged pyramid scheme would subject Amway "to multiple liability for the same conduct and would result in administratively complex damages proceedings." *Conte Bros.*, 165 F.3d at 235. Under P & G's theory, regardless of the remote nature of the injury suffered, every producer or manufacturer of one brand of household goods alleging that its sales have fallen could bring a federal action against the manufacturer of another brand of household products for falsely representing the wealth that its distributors could achieve by selling and purchasing their own products. "[T]he impact on the federal courts could be significant." *Id.*[6]

Given the existence of more direct victims of the alleged pyramid scheme, the "tenuous and speculative character of the relationship between" the alleged Lanham Act violation and P & G's alleged resulting injury as well as the impact on judicial administration, the Court holds that P & G does not have standing to sue under Section 43(a) based on the statements promoting Amway's purported pyramid scheme. Having determined that P & G does not

---

**5.** P & G even states that "distributors at the Emerald level lose money on the Amway-product business." (P & G's Opposition, Instrument No. 279, at 40). According to P & G, "most low-level distributors realize the fraud—that money cannot be made selling Amway products—and quit." (*Id.*).

**6.** The Third Circuit expressly adopted the factors in *Associated Gen. Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983), as the appropriate test for determining statutory standing under Section 43(a) of the Lanham Act. *Conte Bros.*, 165 F.3d at 223. However, P & G does not address any of these factors in its response brief.

have standing to sue, the Court need not address Amway's remaining arguments. P & G's Section 43(a) claim based on these statements is, therefore, DISMISSED.

### F. Vicarious Liability

██ In Count Nine of its complaint, P & G claims that "Amway and/or the Upline Distributors are vicariously liable for the aforesaid misconduct of their distributors, agents, employees, and servants as alleged herein." (Complaint, Instrument No. 86, ¶ 170). Amway contends that P & G's claim for vicarious liability is not actionable because vicarious liability does not constitute an independent cause of action. In *Turner v. Upton County, Tex.*, 915 F.2d 133, 138 n. 7 (5th Cir.1990), the Fifth Circuit recognized that the respondeat superior theory, one of the traditional common law theories of vicarious liability, "[wa]s not, in and of itself, a cause of action." P & G explains that its "vicarious liability count is a shorthand means of asserting claims against Amway for vicarious liability for all of the other counts that allege tortious conduct by Amway's distributors." (P & G's Opposition, Instrument No. 279, at 47). Thus, to the extent that P & G is asserting an independent cause of action for vicarious liability, that claim is DISMISSED. However, P & G's allegations of vicarious liability under Count Nine will be considered as an alternative theory of Amway's liability.

### VII. Conclusion

Accordingly, Amway's Motion for Summary Judgment is GRANTED in PART and DENIED in PART. (Instrument No. 267). P & G's claims for fraud, violations of Section 43(a) the Lanham Act based on the statements promoting Amway's alleged pyramid scheme, and vicarious liability are DISMISSED.

The Clerk shall enter this Order and provide a copy to all parties.